Amos Lee KING, Jr., Petitioner-Appellant,

v.

Charles G. STRICKLAND, Jr., Warden, Florida State Penitentiary, Louie L. Wainwright, and Jim Smith, Attorney General, Respondents-Appellees.

No. 82–5306.

United States Court of Appeals, Eleventh Circuit.

Sept. 2, 1983.

Rehearing and Rehearing En Banc Denied Nov. 4, 1983.

---

Baya Harrison, III, Tallahassee, Fla., for petitioner-appellant.

Michael J. Kotler, Asst. Atty. Gen., Tampa, Fla., for respondents-appellants.

Before RONEY and KRAVITCH, Circuit Judges, and TUTTLE, Senior Circuit Judge.

RONEY, Circuit Judge:

Convicted of first degree murder and sentenced to death, Amos Lee King, Jr. appeals the federal district court's denial of his petition for a writ of habeas corpus. He raises a number of arguments as to both conviction and sentence. Although we affirm on all issues raised as to the conviction, we hold that counsel was ineffective during the penalty phase. We discuss King's other claims going to the validity of the sentence, as to which we find no error. As to these latter points, we affirm.

In March of 1977, King was an inmate at Tarpon Springs Community Correctional Center, a minimum security work release facility, where he was serving a sentence for larceny of a firearm. On March 17 he worked at a Clearwater restaurant from 5:00 p.m. until 1:00 a.m. the following morning. An inmate van picked him up at around 1:30 a.m., and he checked back into the facility at approximately 2:35 a.m. At about 3:40 a.m., the prison counselor, James McDonough, discovered King missing during a routine bed check. McDonough found King outside the building with blood on his pants. After McDonough escorted King back into the facility, a fight broke out between the two in which King repeatedly stabbed McDonough with a knife. King then fled the facility.

In the meantime a fire had broken out at a house approximately 1,500 feet from the correctional center. Police arrived at around 4:05 a.m. and discovered the dead body of Natalie Brady. She had received numerous injuries, including two stab wounds, bruises, and a ragged tear of the vagina which apparently had been caused by blood-stained knitting needles found at the scene. There was evidence of forced sexual intercourse. Arson investigators concluded the fire had been set intentionally sometime between 3:00 and 3:30 a.m.

King voluntarily turned himself in that afternoon. He was indicted for the first degree murder of Natalie Brady, arson, robbery of her home, and involuntary sexual battery. He also was separately charged in a direct information with the attempted murder of McDonough and escape from prison. Over the objection of King's counsel, the indictment and information offenses were consolidated into one case for trial.

The government presented strong circumstantial evidence of King's guilt on the murder charge. Joan Wood, the medical examiner who performed an autopsy on the deceased, for example, testified that King's blood type was present in Brady's vaginal washings. Wood stated that if Brady's assailant had raped Brady with his pants on after causing the tear to the wall of her vagina, blood would have been present on the clothing, as McDonough had found on the crotch area of King's pants. She testified the paring knife used by King to assault McDonough was "consistent" with the wounds found on Brady, but she admitted she could not say this knife caused the wound. A knife salesman testified that the paring knife was manufactured by the same company and was similar in design to other kitchen knives found in Brady's house. An old friend of the deceased testified that the paring knife resembled one Brady kept in her house.

The jury found King guilty of all the offenses alleged, including the first degree murder charge, and recommended the death penalty, which the trial court imposed. The Florida Supreme Court affirmed the convictions and death sentence, *King v. State,* 390 So.2d 315 (Fla.1980), *cert. denied,* 450 U.S. 989, 101 S.Ct. 1529, 67 L.Ed.2d 825 (1981). The Florida courts also denied collateral relief after an evidentiary hearing. *King v. State,* 407 So.2d 904 (Fla.1981). The United States District Court for the Middle District of Florida then denied King's petition for federal habeas corpus relief in an unpublished opinion, but issued a certificate of probable cause to appeal. This appeal ensued.

### Ineffective Assistance of Counsel

In order to understand the basis on which we hold counsel to have been ineffective at the penalty stage of the trial, it is helpful to discuss petitioner's arguments as to the guilt phase.

The sixth amendment guarantees a criminal defendant the right to counsel reasonably likely to render, and rendering, reasonably effective assistance. *Baty v. Balkcom,* 661 F.2d 391, 394 (5th Cir. Unit B 1981), *cert. denied,* 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982); *Washington v. Estelle,* 648 F.2d 276, 278–79 (5th Cir.), *cert. denied,* 454 U.S. 899, 102 S.Ct. 402, 70 L.Ed.2d 216 (1981). In judging whether this standard has been met, the totality of circumstances and the entire record must be considered. *Goodwin v. Balkcom,* 684 F.2d 794, 804 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983); *Nelson v. Estelle,* 642 F.2d 903, 906 (5th Cir.1981). The burden is on the habeas corpus petitioner to establish ineffectiveness and prejudice. *Washington v. Strickland,* 693 F.2d 1243 (5th Cir. Unit B 1982) (en banc), *cert. granted,* —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983).

Whether effective assistance has been afforded is a mixed question of law and fact. *Cuyler v. Sullivan,* 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714–15, 64 L.Ed.2d 333 (1980); *Harris v. Oliver,* 645 F.2d 327, 330, n. 3 (5th Cir.), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 687, 70 L.Ed.2d 650 (1981). Therefore this Court has held that a state court's determination of constitutionally effective assistance is not entitled to a presumption of correctness under 28 U.S.C.A. § 2254(d), and that the federal district court's determination is not protected by the clearly erroneous standard of review on appeal. *Goodwin v. Balkcom,* 684 F.2d 794, 804 (11th Cir.1982). Of course, the historical or primary facts found by the state courts are entitled to a presumption of correctness in a 28 U.S.C.A. § 2254 proceeding in federal court. *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Mason v. Balcom,* 531 F.2d 717, 721–22 (5th Cir.1976).

King was represented by two attorneys from the local public defender's office, Thomas Cole and Anthony Rondolino. Cole, now deceased, was lead counsel, with Rondolino joining the case one week before trial. Although both attorneys were experienced in criminal defense work, neither had handled a death case before.

At the outset, we note that unlike most of the ineffectiveness cases that come before us, in this case two competent attorneys testified at an evidentiary hearing before the state trial court on the motion for collateral relief that King's counsel was not adequate to afford the defendant a fair trial. The state produced no testimony to the contrary. The two testifying attorneys were support counsel Rondolino and Pat Doherty, a Florida defense attorney experienced in death cases. The state judge, who had presided at King's trial, allowed Doherty to proffer his testimony, but ruled it inadmissible because Doherty's standard for judging ineffectiveness did not comport with that of the Florida Supreme Court, as enunciated in *Knight v. State,* 394 So.2d 997 (Fla.1981). The Florida Supreme Court did consider Doherty's proffered testimony, however, *King v. State,* 407 So.2d .at 905, and therefore we do also, without relying on this Circuit's rejection of the *Knight* standard. *Washington v. Strickland,* 693 F.2d 1243, 1267 n. 10 (5th Cir. Unit B 1982)

(*en banc*), *cert. granted,* —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983). Doherty's testimony, like Rondolino's, is part of the record on appeal.

### Guilt Stage

The picture of lead counsel Cole painted by Rondolino and Doherty is of a skilled criminal attorney who for a variety of reasons, some of which were beyond his control, was not ready to proceed to trial. Doherty, who was a friend of Cole's and was at the time of trial in the same Public Defender's office as Cole, testified, for example, that Cole was exhausted during the trial. Cole had been working on a separate criminal case involving a defendant named Scott. The Scott case ended in acquittal 11 days before King's trial began. Doherty testified as to the effect of the Scott case on preparation for King's defense.

> ... Mr. Cole fervently believed in this person's [Scott's] innocence, this man protested his innocence at every turn in the road. This was probably the biggest case Tom Cole ever had as a criminal lawyer. He worried about it day and night and it was in that set of circumstances that the Amos Lee King case was being prepared, if it was being prepared.
>
> In other words, what I am saying to you, at every turn in the road, Amos King's case was being overshadowed by the Scott case. It was a consuming interest of Mr. Cole.

Rondolino, who resided with Cole at the time, confirmed Doherty's account of Cole's engulfing involvement in the Scott case. The trial record reveals Cole's stating on one occasion, "Judge, I am beat, I have got to go home and get some sleep", and stating on another occasion, "I can't think any more." One tangible example of how the Scott case seems to have adversely affected Cole's preparation for the King case is the course of defense depositions of government witnesses. Most of the depositions were taken between the first Scott trial, which resulted in a mistrial, and the second. At least 26 were taken in one day and 11 on another. Other depositions were not taken until after King's trial had begun.

Rondolino described another adverse factor in the preparation for trial. Four days before trial, the Florida Rules of Criminal Procedure were amended to permit the state to move for consolidation. On the morning of the scheduled trial in both cases, the state made such a motion, which the court granted over defense counsel's objection. Rondolino and Cole told the trial judge they were prepared to proceed with either case that day, but not with both together. Cole stated, "Judge, as an officer of the court, I cannot give Amos King a fair trial today or this week." The defense, which had received two previous continuances, asked for another, which the court denied.

Rondolino indicated at trial and at the subsequent hearing that the consolidation without a continuance threw defense strategy out of whack. At trial he stated:

> ... since I have been working with Mr. Cole in this case, it has been the consensus of our opinion that we were going to proceed one at a time on these cases. Mr. Cole and I had planned the cases in that light, and it puts a totally different face on the case when both of them are consolidated. For instance, tactics as far as introduction of evidence, objections to be made in regard to testimony of witnesses about the surrounding facts, what we plan to present, just numerous, numerous things, Judge, and if we are going to be forced to go ahead and go to trial this week on a consolidated case, we are just not prepared, Judge, for the record....

He elaborated at the collateral relief hearing, explaining that the defense attorneys felt they could present a viable defense to the indicted charges involving the Brady incident without presenting any affirmative defense by simply pointing out holes in the government's case, but that this "beyond a reasonable doubt" strategy became unviable when the charges involving the McDonough incident were consolidated.

There are some indications in the record, however, that defense counsel may have foreseen the possibility of a consolidation. In direct conflict with the statements of

defense counsel, a state attorney represented to the trial judge that, in his frequent conversations with the defense attorneys, they indicated they planned on a consolidated trial. The judge recalled that two weeks before trial when defense counsel obtained a continuance "it was represented to me ... that all of the cases were going to be tried at one time." On appeal, the Florida Supreme Court found that defense counsel "was prepared to try all offenses on the trial date." *King v. State,* 390 So.2d at 318.

At trial, Cole suggested another difficulty counsel experienced in preparing for trial. Cole and Rondolino moved to withdraw as counsel, with Cole stating:

> ... the defendant, Mr. King, does not have confidence or is not satisfied with the representation that I have made in his behalf, and I feel that because of his lack of confidence that he has in me, that I cannot effectively communicate with him to prepare adequately to represent him today, and would renew my motion to withdraw at this time.....

King, who also testified at the evidentiary hearing, stated that Cole met with him only twice prior to trial. Cole told the trial judge at a pretrial hearing, however, that he had spoken with his client four or five times.

A number of failures by counsel during the trial raise some question as to ineffectiveness. Cole, for example, failed to bring up on cross-examination the weakness in the testimony of a key government witness. Alma Tarpley, the deceased's long-time friend, testified that she had seen a knife similar to that used by King in the attack on McDonough in Brady's kitchen on Anclote Road. Earlier testimony revealed that Brady had lived on a different street since around 1960. Thus defense counsel could have called attention to the fact that Tarpley had not seen the knife she claimed was similar for about fifteen years. Cole did not cross-examine Tarpley, but he did stress in closing argument that Tarpley could not identify the knife as belonging to Brady.

Similarly, Cole failed to challenge, as scientifically significant, the statement by the medical examiner, Joan Wood, that the paring knife used by King to attack the guard and allegedly Brady was "consistent" with Brady's wounds. Cole got Wood to acknowledge on cross-examination, however, that she could not determine this particular type of knife caused the injury, and he emphasized this point in closing argument. Testifying at the hearing that he had never heard any witness imply a knife could be matched to a wound, Doherty stated Cole could have further destroyed Wood's testimony.

Perhaps more significantly, counsel failed to present a piece of potentially exculpatory evidence. An FBI agent, Robert Neill, had examined a sample of Brady's pubic hair, her nightgown and the ambulance sheets within which she had been wrapped. He testified briefly on direct to establish a chain in the custody of certain exhibits, but when Cole began cross-examining him about his findings, the court sustained an objection to the questions as beyond the scope of direct. On proffer, he stated he found no hairs of negro origin in the pubic sample or in the sheets. He found a dark human hair fragment on the nightgown but could not identify it as to race. Cole did not call Neill on direct, even after learning this information.

The lower state court which held the evidentiary hearing did not reject, as establishing historical facts, any of the evidence presented by King. Since the evidence was uncontradicted, it can be assumed the court simply determined, as a matter of law, that these facts and the trial record did not demonstrate counsel was ineffective. The state judge, who had presided at King's trial, stated immediately upon the close of the evidence at the collateral attack hearing:

> The motion that has been filed by the Defendant, that being the 3.850 motion, is denied, the Court having found, based upon having heard the testimony, presided over the trial, observed counsel for the Defendant during the trial, having had the opportunity of Mr. Cole as part of this record here today, reasonably prior to

this trial, not immediately prior but reasonably prior, having had the opportunity of receiving an acquittal for his client after a prior mistrial in a very horrendous murder and I certainly do not argue with the jury's verdict. But for the purposes of these comments are just to advise you and your client is that even based upon what I have heard here today, and based upon the law of this state as I understand it to be, that there has not been shown that your client was ineffectively represented by counsel.

To the contrary, again based upon not only what I heard during the trial, but what I heard here today, I think that the record would conclusively show that the Defendant is entitled to no relief.

The law of Florida relied upon by the trial court was undoubtedly that set forth in the leading Florida ineffectiveness case, *Knight v. State,* 394 So.2d 997 (Fla.1981), which had been decided some ten months before the state collateral hearing.

The Supreme Court of Florida, performing its review function, likewise did not reject any of the facts presented at the state hearing. Accepting all of the evidence, including Doherty's testimony, the court also applied the *Knight* standard:

The trial judge found that Cole provided effective assistance of counsel. Our review of the evidence fails to disclose otherwise. We fail to find any single act of omission or commission, or any series or combination thereof, that was a substantial and serious deficiency measurably below that of competent counsel. Even if Doherty's testimony to the contrary is accepted, no act, or combination of acts, was substantial enough to demonstrate prejudice to the defendant to the extent that there is a likelihood that any substandard conduct affected the outcome of the court proceedings. *See Knight v. State,* 394 So.2d 997 (Fla.1981).

407 So.2d at 905.

From the district court's opinion and order, it appears that it also analyzed specific allegations concerning the omissions and conduct of counsel in terms of the likelihood that they affected the outcome of the proceedings. The district court said: "nowhere does it appear that to have undertaken to act as the Petitioner now claims his trial counsel should have acted would have changed the verdict or the sentence."

■ After these courts had decided this case, this Circuit rejected the *Knight* standard so that ineffectiveness, or more precisely the prejudice flowing from any ineffectiveness, must be measured under the test enunciated in *Washington v. Strickland,* 693 F.2d 1243 (5th Cir. Unit B 1982) (en banc), *cert. granted,* —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983). Under that test, the habeas corpus petitioner must demonstrate that counsel's ineffectiveness "resulted in actual and substantial disadvantage to the course of his defense" but need not show that this "disadvantage determined the outcome of the entire case." 693 F.2d at 1262.

■ Even under this less stringent standard, however, King is not entitled to relief. The alleged deficiencies in counsel's preparation are supported neither by a close reading of the record nor by the law. For example, the record does not substantiate King's argument that Cole never deposed a few key government witnesses. Support counsel testified that the records of the public defender's office showed no transcribed depositions for nine government witnesses, but he acknowledged that depositions are often not transcribed. He could not say for sure, and there is no other probative evidence, that a single government witness had not been deposed. In fact, it is evident from the record that depositions were taken from at least the vast majority of potential government witnesses. Although some of the depositions were taken after trial commenced, Doherty testified that he had done the same thing in some cases and that this practice is not a fatal defect in a murder trial.

Similarly unavailing is King's claim that Cole's preparation suffered because of his consuming involvement in the Scott case. The trial in that case ended eleven days

before the King trial began. The only tangible evidence suggesting the Scott case adversely affected the representation of King is that many of the depositions in the King case were taken during a two-day period between the first Scott trial, which ended in a mistrial, and the second. King does not suggest any beneficial facts Cole would have learned if he had taken the depositions in a less rushed manner.

■ Neither the law nor the record substantiates King's claim that he met with counsel only twice prior to trial. Cole told the trial judge he had spoken with his client on four or five occasions, and, even if King's testimony is credited, counsel may be effective even if he spends only a short period of time with his client. *Jones v. Wainwright,* 604 F.2d 414, 416–17 (5th Cir. 1979); *Howard v. Beto,* 466 F.2d 1356, 1357 (5th Cir.1972), *cert. denied,* 410 U.S. 956, 93 S.Ct. 1428, 35 L.Ed.2d 689 (1973).

■ There are two problems with King's assertion that counsel was not prepared to try together the indicted charges of murder, robbery, arson and involuntary sexual battery with the information charges of attempted murder and escape. First, the trial judge, who was in a far better position to know the truth than this Court, evidently believed defense counsel had foreseen a consolidation. He indicated the parties had told him the charges would be tried together. The Florida Supreme Court viewed the record similarly, stating that the charges had been treated together in pretrial proceedings. That court's finding that defense counsel was ready to try all the charges together is entitled to a presumption of correctness. *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

Second, the Florida Supreme Court, the final arbiter of state law, stated that the evidence of the attempted murder and escape would have been admissible in a separate trial of only the indictment offenses. *King v. State,* 390 So.2d at 318. Thus, even if defense counsel did not anticipate a consolidation, it is hard to see how this lack of foresight prejudiced King.

■ The testimony of Rondolino and Doherty that Cole was exhausted and the statements by Cole himself to that effect during trial certainly give us some pause. But even if Cole was extremely tired, this alone does not establish ineffectiveness. There must be some showing he committed errors because of his condition. A tired lawyer is not necessarily an ineffective lawyer.

King essentially points to three supposed errors by counsel during trial: the failure to call FBI agent Neill on direct, and the failure to do more to refute the testimony of two government witnesses, Tarpley and Wood. Neill's testimony would have been of substantial benefit to King only if he had found a non-Negroid hair, not belonging to the victim, in the material he examined. Brady was undoubtedly sexually assaulted and murdered. The only question at trial was whether King was the perpetrator of the crimes. The absence of any hair of any racial origin simply would not have been probative of whether a black man was the guilty party.

Cole did not ask Neill whether he had found a non-Negroid hair, perhaps because Cole knew the answer from the FBI report which he apparently had. King does not represent to us that Neill had in fact found a non-Negroid hair. Thus King has not established that the failure to call Neill caused King to lose any valuable testimony.

■ With respect to Wood, the medical examiner who testified that the paring knife was "consistent" with the wounds found on the victim, it cannot be assumed that Cole could have obtained an expert witness to refute Wood's testimony. Even if counsel could have found a rebuttal witness, by presenting the testimony he would have lost the right to both the first and last closing arguments. Fla.R.Crim.P. 3.250. In any event, Cole got Wood to acknowledge on cross-examination that she could not determine this particular knife caused the injury, and he stressed this point in closing argument. Especially given these circumstance, decisions as to whether to call witnesses to the stand and whether to ask

particular questions must be viewed as tactical matters. *United States v. Rubin*, 433 F.2d 442, 445 (5th Cir.1970), *cert. denied*, 401 U.S. 945, 91 S.Ct. 961, 28 L.Ed.2d 228 (1971).

As to Tarpley, the deceased's friend who testified that the knife allegedly used by King resembled one of Brady's, Cole emphasized in closing argument that Tarpley could not identify the knife as belonging to Brady. Thus, once again, Cole did remove much, if not all, of the sting from the government witness' testimony.

In short, King has not met his burden to establish ineffective representation at the guilt phase of the trial.

### Penalty Stage

 Counsel's duty to his client extends beyond the guilt stage of the trial to the sentencing proceeding. *Stanley v. Zant*, 697 F.2d 955, 963 (11th Cir.1983). King argues that lead counsel Cole was ineffective at the penalty phase of the trial because he failed to present available character witnesses and made a weak closing argument.

There are indications in the record that counsel failed to conduct an exhaustive investigation for potential mitigating evidence. Prior to the penalty stage, Cole told the trial judge he had not discussed this part of the trial with his client and asked for a one-day continuance so he could speak to possible defense witnesses. The court denied the request. Although King apparently furnished his lawyer with a list of six possible character witnesses, there is no indication the lawyer contacted all of them to determine whether their testimony might be helpful.

Nonetheless, Cole did present some mitigating evidence on behalf of his client. Cole called one character witness, a minister and former employer of King in the gardening business, who testified that King was a good worker whom he never knew to be violent during the twenty years they were acquainted. Cole also called the jury's attention to the testimony during the guilt phase of the trial of two witnesses: King's employer at the restaurant, who described the defendant as an excellent employee, and the head of the correctional center, who termed the defendant a good inmate without disciplinary problems. In addition, Cole informed the jury of a conversation he had had with King's former attorney, who indicated he viewed the defendant as unintelligent and uneducated, but not violent.

In support of his claim that Cole should have presented additional mitigating evidence, King called two long-term acquaintances at the state post-conviction relief hearing. Both witnesses stated they had attended the trial, apparently at the request of defense counsel, but had not been called to testify. They indicated that if called they would have confirmed that King was a good, non-violent person and a trustworthy employee. One of the acquaintances acknowledged, however, that King had a reputation for burglaries. He indicated many other people would have testified on defendant's behalf if they had been asked. Support counsel testified at the hearing that additional character witnesses should have been called.

Although Cole presented some mitigating evidence, it is clear that counsel neglected to present other available evidence. The record also suggests this failure cannot be deemed a strategic decision taken after a reasonable investigation into the alternatives. This Court has emphasized the importance of pretrial preparation and investigation. *See Washington v. Strickland*, 693 F.2d 1243, (5th Cir. Unit B 1982) (en banc), *cert. granted*, —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983); *Goodwin v. Balkcom*, 684 F.2d at 804–05, *cert. denied*, —— U.S. ——, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983); *Rummel v. Estelle*, 590 F.2d 103, 104–05 (5th Cir.1979). Here, counsel admitted he was unprepared for the penalty stage of the trial, because he had not adequately discussed sentencing with his client nor had he carefully searched for mitigating evidence.

These errors occurred at a particularly critical point in the trial.

The sentencing stage of any case, regardless of the potential punishment, is "the time at which for many defendants the most important services of the entire proceeding can be performed." ABA Standards on the Administration of Criminal Justice, Sentencing Alternatives and Procedures § 5.3(e). The special importance of the capital sentencing proceeding gives rise to a duty on the part of defense counsel to be prepared for that crucial phase of the trial.

*Stanley v. Zant,* 697 F.2d at 963. Although this Court apparently has never held counsel ineffective in a capital case solely because of failure to present mitigating evidence, *see id.* at 964, it has on a number of occasions cited this failure as one factor suggesting ineffectiveness. *See Young v. Zant,* 677 F.2d 792, 799 (11th Cir.1982); *Kemp v. Leggett,* 635 F.2d 453 (5th Cir. 1981); *Mason v. Balcom,* 531 F.2d 717, 724 (5th Cir.1976).

As in those cases, counsel here did not merely neglect to present available mitigating evidence. He made a closing argument that may have done more harm than good. In his argument, the main thrust of which was that the defendant if given life would be secured in prison for many years, King's attorney unnecessarily stressed the horror of the crime and counsel's status as an appointed representative:

"It is extremely difficult for me to talk to you at this time. This is the first time that I have ever been in a position like this. I have been practicing law for three years now, Assistant Public Defender and I have never defended a murder case before. I think that you all understand that the job I had to do this week and you can appreciate what I had to do.

You can convict Amos of a cruel and evil crime. There is no doubt about it. Murder upsets me very much and I am also human, I have feelings, I have been to Raiford which is the State Prison.

Now you might not think that Amos deserves to live in our society of civilized people. You might not consider him

right now as a human being and what you convicted him of was an evil and gross crime but I am not asking you to put him back out on the streets or take a chance that he will ever be back out there because in Florida the legislature passed a law which means that when you convicted a man of first degree murder, if you don't, if he is not sent to the electric chair, then he automatically goes to prison for life and for twenty years he is not eligible for parole. He is not eligible for parole. He will be in maximum security at Raiford, not a work release center."

In effect, counsel separated himself from his client, conveying to the jury that he had reluctantly represented a defendant who had committed a reprehensible crime. "[R]eminding a jury that the undertaking is not by choice, but in service to the public, effectively stacks the odds against the accused." *Goodwin v. Balkcom,* 684 F.2d at 806, *cert. denied,* —— U.S. ——, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983). Rather than attempting to humanize King, counsel in his closing argument stressed the inhumanity of the crime.

■ We hold that this argument in combination with counsel's failure to present available mitigating evidence denied King effective assistance of counsel at the penalty stage of the trial.

*Death Penalty Based on Felony Murder*

■ King argues he could not be constitutionally sentenced to death because he was convicted under the Florida felony murder rule, which does not require a showing of intent to kill. Fla.Stat.Ann. § 782.-04(1). King did not raise this point to the Florida Supreme Court on direct appeal. Under Florida law, this procedural default precluded consideration of the issue on a motion for collateral relief. *Hargrave v. State,* 396 So.2d 1127 (Fla.1981). Although King mentioned the point in his motion for post-conviction relief, he did not raise it on appeal from the denial of the collateral relief motion and the Florida Supreme Court did not discuss the question. The failure to bring up an issue on appeal, no

less than at trial, may preclude federal habeas corpus review. *Ford v. Strickland,* 696 F.2d 804, 816–817 (11th Cir.1983) (en banc), *petition for cert. filed,* [No. 82–6923] (U.S. June 14, 1983); *Huffman v. Wainwright,* 651 F.2d 347 (5th Cir.1981); *Evans v. Maggio,* 557 F.2d 430 (5th Cir.1977). King has proffered no justification for not raising the point, so his unexcused procedural default prevents us from reaching the merits of his claim, but it is worth noting that in a similar set of facts we rejected this argument on its merits. *Adams v. Wainwright,* 709 F.2d 1443, 1446–47 (11th Cir.1983).

### *Non-Record Material Before the Florida Supreme Court (The Brown Issue)*

■ King was one of the Florida death row inmates who unsuccessfully sought collateral relief in state court based on the Florida Supreme Court's alleged use of non-record material in reviewing death sentences. *Brown v. Wainwright,* 392 So.2d 1327 (Fla.), *cert. denied,* 454 U.S. 1000, 102 S.Ct. 542, 70 L.Ed.2d 407 (1981). His attack in federal court on the Florida court's alleged practice is foreclosed by *Ford v. Strickland,* 696 F.2d 804 (11th Cir.1983) (en banc), *petition for cert. filed,* [No. 82–6923] (U.S. June 14, 1983). King lacks any specific evidence that the Florida Supreme Court actually relied on non-record material in his case.

### *Restriction on Jury's Consideration of Mitigating Circumstances*

Because our decision requires that King be resentenced, we do not need to consider the argument that the trial court's instruction limited the jury's consideration to statutory mitigating circumstances, in violation of *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

### *Removal of Prospective Juror Who Opposed the Death Penalty: The Witherspoon Issue*

King argues that the trial court violated *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), by excusing for cause venire member Holenda. In *Witherspoon,* the Supreme Court held that veniremen cannot be excluded for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Id.* at 522, 88 S.Ct. at 1777. The Court carefully admonished, however

> ... that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt....*

*Id.* at 522 n. 21, 88 S.Ct. at 1777 n. 21 (emphasis in original); *accord Adams v. Texas,* 448 U.S. 38, 44, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980).

■ A careful review of the colloquy between the trial judge and venire member Holenda reveals that the second basis for exclusion provided in *Witherspoon* and *Adams* applies here: the prospective juror could not be impartial in deciding the defendant's guilt. Because the questions asked of Holenda referred back to questions asked of the last two prospective jurors, the colloquy involving all three must be reviewed.

THE COURT: Again I will direct this question to each of those of you who have just entered the box: As you are aware, one of the charges against this defendant carries a possible punishment of death in the electric chair. Do any of you have any conscientiously held opinions as to the death penalty that would prevent you from reaching a verdict?

\* \* \* \* \* \*

THE COURT: Mr. Farmer?

VENIREMAN FARMER: Yes, sir.

THE COURT: In other words, you do not feel that you could reach a verdict—

VENIREMAN FARMER: Yes, sir. I do not believe in capital punishment.

THE COURT: Well, that's not the—really the question.

VENIREMAN FARMER: Well, if I were to go on and it would be a part of the verdict that gave an advisory for you for death, I could not be a part of it.

THE COURT: Well, here—let me back up a little bit. As to the capital offense, the only—your function there would be to determine whether in fact he was guilty or innocent of the charge. That would be number one, if it would be, and my question then was, could you find a verdict based upon the testimony and the law as to his guilt or innocence.

VENIREMAN FARMER: Not knowing that the possibility was there, sir, that it would mean death.

THE COURT: All right, sir. You may step down then, Mr. Farmer.

&ast; &ast; &ast; &ast; &ast; &ast;

Frank Carter.

THE COURT: Okay. Now what about possible penalty that could be imposed? Do you have any conscientiously held opinion with respect to capital punishment that would prevent you from reaching a verdict?

VENIREMAN CARTER: No, your Honor.

THE COURT: In other words, Mr. Farmer just candidly indicated to the Court that he could never vote—that he could never reach a verdict with respect to an offense such as this. Do you feel that you could reach a verdict based upon the law and evidence?

VENIREMAN CARTER: Yes, sir.

THE COURT: Do you have any reason at this time that you could not serve fairly and impartially?

VENIREMAN CARTER: Not to my knowledge.

THE COURT: Mr. Holenda and Mrs. King, did I ask you these questions also with respect to the penalty?

VENIREWOMAN HOLENDA: You didn't ask. I'm sorry, I don't believe that I could be impartial. I'm against capital punishment.

THE COURT: Well, here again, as I indicated to Mr. Farmer, even though you are against capital punishment, the jury itself would not be imposing the same. You would be asked to reach a verdict based upon the testimony, the evidence, and the law based as to his guilt or innocence as to each of the charges, and then as to the punishment as it relates to capital punishment. You would then be asked to vote to advise the Court as to what the jury feels would be the proper punishment. I would not be bound by your opinion, however.

VENIREWOMAN HOLENDA: I understand, but I do feel strongly about it. I'm sorry, but that's exactly how I feel.

THE COURT: Okay. You may step down.

Venire member Holenda specifically stated she could not be impartial, and, viewing the colloquy involving all three jurors, it is clear that the question related to her verdict as to guilt or innocence, not her recommendation as to sentence. Accordingly, her exclusion was proper.

*Denial of an Evidentiary Hearing on Ineffectiveness and Summary Rejection of Issues Other Than Ineffectiveness*

King faults the district court for deciding the ineffectiveness issue without first affording him an evidentiary hearing. Because of our decision as to ineffectiveness at the penalty phase of the trial, it is unnecessary to discuss King's argument that the district court should have held a hearing on ineffectiveness during the penalty stage.

 As to King's claim that an evidentiary hearing should have been held regarding ineffectiveness at the guilt phase of the trial, we would not reverse the district court. In his opinion denying the writ, the district judge noted that defense counsel had told him a hearing was unnecessary before he ruled on King's motion to stay the judgment. Without deciding whether this amounted to a waiver which extended to a decision on the habeas corpus petition, a

habeas corpus petitioner is not entitled to a hearing on ineffectiveness if the state court record is sufficient. *Winfrey v. Maggio,* 664 F.2d 550, 551–52 (5th Cir.1981). Here a state court had held an evidentiary hearing on the ineffectiveness claim at which two potential character witnesses who were not called at trial and two attorneys, including support counsel, had testified for the defendant. King did not suggest what additional evidence he hoped to develop before the district court. The court could properly decide the issue without a hearing.

King also claims the district court should have explained its reasons for rejecting each of his claims, rather than summarily dismissing all except ineffectiveness as "without merit". Although it is often advisable for the district court to provide a brief explanation of its disposition of each claim, this practice is not required where the court "reject[s] claims which it regards as frivolous or totally without merit." *Washington v. Strickland,* 693 F.2d 1243, 1264 n. 34 (5th Cir. Unit B 1982) (en banc), *cert. granted,* —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983) (quoting *Sumner v. Mata,* 449 U.S. 539, 548, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981)). We have reviewed each claim and, for the reasons set forth in this opinion, affirm the denial of relief based on issues other than ineffectiveness.

*Admission of Statements Made by King*

Denying King's motion to suppress, the trial court permitted a police officer to testify about the statements made by King after his arrest and receipt of *Miranda* warnings, including two conflicting statements concerning how he obtained the knife used to attack McDonough. First he told the arresting officers that the knife was his and he had possessed it for weeks. Later he told the officers that it was McDonough's knife which he had taken from McDonough after the prison official had attacked him. King testified at the motion to suppress that he had asked for a lawyer before any questioning. The police officers gave contrary testimony, indicating that King had not asked for a lawyer until after he had made the statements about the knife.

The trial court evidently believed the police officers, not King. It excluded only statements made after the time the officers testified King first requested an attorney, expressly finding that all prior statements were freely and voluntarily given.

The federal court must accept the findings of the state court as to the credibility of King and the officers, just as any appellate court must accept the findings of a trial court where credibility choices are involved. *See United States v. Kreczmer,* 636 F.2d 108, 110 (5th Cir.1981) (credibility choices on motion to suppress are within province of finder of fact); *United States v. Howard,* 451 F.2d 1003, 1004 (5th Cir.1971) (credibility choice involving conflicting evidence as to whether police agent gave defendant *Miranda* warnings is for the trial judge).

*Consolidation*

King contends the consolidation of the attempted murder and escape charges, arising out of the incident involving prison counselor McDonough, with the arson, robbery, involuntary sexual battery and murder charges, arising out of the incident involving Brady, denied him a fair trial. In concluding that consolidation was proper under state law, the Florida Supreme Court indicated the evidence of the prison incident would have been admissible at the murder trial even without consolidation. *King v. State,* 390 So.2d 315, 318 (Fla.1980), *cert. denied,* 450 U.S. 989, 101 S.Ct. 1529, 67 L.Ed.2d 825. The Florida court also found that defense counsel was prepared to try all charges on the trial date. *Id.* This finding of fact is entitled to a presumption of correctness under 28 U.S.C.A. § 2254(d); *Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981), and the Florida Supreme Court is the ultimate source of state law. *Ford v. Strickland,* 696 F.2d 810 (11th Cir.1983) (en banc), *petition for cert. filed,* [No. 82–6923] (U.S. June 14, 1983). The consolidation hardly caused the defendant great prejudice. It certainly, by itself, did not make the trial fundamentally unfair.

### Restriction on Defense Questioning During Voir Dire

Sustaining the prosecutor's objection, the trial judge refused to permit defense counsel to ask prospective jurors whether they favored a mandatory death penalty for certain crimes. The Florida Supreme Court succinctly explained why this question was irrelevant:

> The purpose of voir dire examination is to obtain a fair and impartial jury to try the issues in the cause ... The subject question, however, did not address the juror[s]'s impartial application of existing law, but rather it concerned [their] conception of what laws should exist.

*King v. State,* 390 So.2d at 319. All of the jurors who were eventually selected indicated they could reach a decision based on the law and evidence. The restriction on *voir dire* questioning did not deny King a fair trial.

The denial of the petition for habeas corpus relief is affirmed, insofar as it attacks the constitutionality of the conviction, but reversed as to the death penalty. The case is remanded to the district court for entry of an appropriate writ.

AFFIRMED IN PART, REVERSED IN PART and REMANDED.