**Johnnie L. JOHNSON, Plaintiff,**

**v.**

**Ralph KEMP, Warden, Georgia Diagnostic and Classification Center, Defendant.**

**Civ. A. No. 483–254.**

United States District Court, S.D. Georgia, Savannah Division.

April 23, 1984.

Alice C. Stewart, Atlanta, Ga., for plaintiff.

Susan V. Boleyn, Asst. Atty. Gen., Atlanta, Ga., for defendant.

## ORDER

ALAIMO, Chief Judge.

Petitioner Johnnie L. Johnson was sentenced to death by the State of Georgia on July 17, 1975, for the murder of Susan Edenfield. After he had exhausted all avenues of appeal in the state courts, Johnson was scheduled to be executed in Georgia's electric chair on July 1, 1983. By Order of this Court issued June 29, 1983, Johnson's execution was stayed pending review of his petition for a writ of habeas corpus.

In his petition, Johnson has raised a multitude of arguments that his constitutional rights were violated during both the guilt and penalty phases of his trial. At a plenary evidentiary hearing before this Court on December 9, 1983, counsel for petitioner and the state disputed the merits of those contentions. Based on the evidence and representations of the parties at that hearing and a thorough review of the transcripts of Johnson's original trial and state appeals, the Court now addresses the substance of Johnson's petition.

## FACTUAL BACKGROUND

In 1974, Johnnie Johnson was living in Beaufort, South Carolina. He had been discharged from an Army career in which he had initially shown promise, but which later soured during a tour of duty in Europe. While stationed in Germany, Johnson had become involved in the use of marijuana and other drugs. That behavior resulted in Johnson's general discharge from the service.

On his return to the United States, Johnson went back to Beaufort. On July 20, 1974, he and a friend, Jerry Thomas Sprouse, decided to travel to Savannah to attend a "rock" concert. Finding the concert sold out, the two men drove around Savannah for a time. The concert was over around 11:00 p.m. and, in the traffic leaving the concert, Johnson and Sprouse pulled up next to a Volkswagen occupied by two women aged 19 or 20. Their names were Susan Edenfield and Mary Lynn Harrod. One of the men asked the girls if they would like to stop and smoke some marijuana with Johnson and Sprouse. The girls said yes and led Johnson and Sprouse to the parking lot of Savannah High School. The four left their cars and smoked on the curb in the parking lot for approximately one-half hour. After smoking several "joints," the girls got up to leave.

As they tried to enter their car, Jerry Sprouse appeared by the driver's side door with a gun. He forced the two girls into Johnson's cream-colored Chevrolet, and Johnson drove the four of them out to U.S. Highway 17. On the ride out of town, Sprouse tied both of the girls' hands, and Mary Lynn Harrod was gagged.

The group arrived near the woods off Highway 17 on Little Neck Road. At that point, Johnson took Susan Edenfield away from the car. Sprouse remained with Harrod in the car. Removing all of her clothes, Sprouse attempted to rape Harrod, apparently without success. Johnson returned with Edenfield a short time later. Edenfield was wearing only her jeans, and she told Harrod that Johnson had raped her.

Wielding the gun used earlier to kidnap the two girls, Sprouse directed Johnson to remove the rest of Edenfield's clothing. The two girls were then led, naked, to the side of the road. Sprouse told Johnson to turn the car around in the road. Later, at the trial of Johnson, Mary Lynn Harrod testified that only Sprouse had held the gun throughout the evening's events, and in fact Johnson was never seen with the gun in his possession or control the entire night.

With the girls' backs to the car and the two men, Harrod heard a shot ring out which struck Susan Edenfield. Harrod turned, but was also struck by a gunshot before she was able to see who was firing the shots. Each girl was then shot once more. Susan Edenfield died of her

wounds, but Mary Lynn Harrod survived and was able to reach a nearby house to notify police of the attack on herself and Edenfield.

Sprouse and Johnson fled the scene and, on reaching South Carolina, burned Johnson's car. The two then continued north, eventually spending time in South Dakota and Canada. Johnson returned to South Carolina and was apprehended on July 31, 1974, in a laundromat at Shaw Air Force Base.

Mary Lynn Harrod testified at Jerry Sprouse's trial, where he was convicted of first-degree murder, rape and aggravated assault. Sprouse received the death penalty for his murder conviction, but his sentence has twice been vacated by the Georgia Supreme Court. *Sprouse v. State*, 242 Ga. 831, 252 S.E.2d 173 (1979); *Sprouse v. State*, 250 Ga. 174, 296 S.E.2d 584 (1982). Sprouse is currently confined in the Georgia State Prison awaiting a resentencing hearing.

Petitioner Johnnie Johnson stood trial on July 7, 1975, and was convicted of kidnapping, rape, attempted rape (directed verdict) and the murder of Susan Edenfield. The jury found, under Georgia Code § 17–10–30(b)(7), that Johnson's crime of murder was "outrageously or wantonly vile, horrible, or inhuman in that [it had] involved torture, depravity of the mind, or an aggravated battery on the victim." Based on that statutory aggravating circumstance, the jury recommended that Johnson receive the death penalty. Johnson's death sentence was upheld both on direct appeal in the Georgia courts, *Johnson v. State*, 242 Ga. 649, 250 S.E.2d 394 (1978), and in state habeas proceedings, *Johnson v. Zant*, 249 Ga. 812, 295 S.E.2d 63 (1982).

In his petition to this Court for federal habeas corpus relief, Johnson has present-ed an exhaustive collateral attack on most every aspect of his state trial. The majority of petitioner's claims are not presented for the Court's direct scrutiny,[1] but are challenged under the rubric of "ineffective assistance of counsel." In addition to the claim that his Sixth Amendment rights to effective representation were violated, Johnson also substantively attacks: (1) the composition of his trial jury, on the basis that it failed to satisfy the requirements of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); (2) the constitutional validity of the trial court's charges to the jury on reasonable doubt and evidence in mitigation of the death penalty; (3) the admission of evidence of specific prior acts of misconduct committed by the petitioner; (4) the propriety of the prosecution's opening and closing remarks to the jury; (5) the denial of petitioner's motion for a change of venue; and, (6) the validity of petitioner's death sentence under the Eighth Amendment's requirement that a sentence be proportional to the crime committed.

## DISCUSSION

### I. Guilt Phase

 The Court will first address petitioner's claims that he received ineffective assistance of counsel during the guilt phase of his trial. In its inquiry, the Court is not bound by the findings of any previous court in determining the propriety of petitioner's trial representation. *Goodwin v. Balkcom*, 684 F.2d 794, 804 (11th Cir. 1982), *cert. denied*, ── U.S. ──, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983). The standard of performance to which counsel must conform to satisfy the Sixth Amendment was recently described by the Eleventh Circuit Court of Appeals in *Sullivan v. Wainwright*, 695 F.2d 1306 (11th Cir.1983):

---

**1.** The Supreme Court's recent efforts to limit the expansive habeas corpus relief made available by the Court's decision in *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), have merely forced petitioners to reframe their claims for habeas relief. Rather than directly questioning the validity of state procedures leading to their convictions, petitioners now collat-erally challenge those same procedures in the guise of claims of "ineffective assistance of counsel." The scope of judicial review of this new defense strategy has not been examined to any significant degree as yet. *See* Tague, *Federal Habeas Corpus and Ineffective Representation of Counsel: The Supreme Court Has Work To Do,* 31 Stan.L.Rev. 1 (1978).

The standard is not errorless counsel or counsel judged with the benefit of 20/20 hindsight. *Proffitt v. Wainwright* [685 F.2d 1227], at 1247; *Mylar v. State*, 671 F.2d 1299, 1301 (11th Cir.1982). Rather, the assistance rendered must be evaluated from the perspective of counsel, taking into account all the circumstances of the case, but only those circumstances known to counsel at that time. *Proffitt v. Wainwright*, at 1247. 695 F.2d at 1308–09. Counsel's performance consists necessarily not only of his conduct of the defense at trial, but also of any efforts expended investigating and preparing his client's case for trial. *Goodwin v. Balkcom, supra* at 805.

William P. Franklin, Jr., was appointed by the state court to represent Johnson at his trial. That appointment was made after Johnson was extradited from Sumter, South Carolina, to Chatham County, Georgia. Franklin handled petitioner's case up to the initiation of state appeals, which were handled by another attorney. Petitioner alleges that Franklin committed the following errors while conducting Johnson's defense at the guilt phase of trial: (1) counsel failed to request a *Jackson-Denno* hearing to determine the admissibility of statements Johnson made to the police immediately after his arrest in South Carolina and prior to the appointment of counsel; (2) counsel failed to investigate the availability of witnesses useful to the defendant concerning Johnson's culpability, or interview witnesses that were known to counsel at the time of trial; (3) counsel failed to assemble expert testimony regarding Johnson's mental well-being to support a diminished capacity defense; (4) counsel did not dispute the prosecution's forensic evidence that Susan Edenfield's death had been "vile, wanton, and horrible"; (5) counsel failed to challenge the array of the grand and traverse jury pools in Chatham County; (6) counsel erred in eliciting incriminating statements from his client on direct examination; (7) counsel failed to develop all tenable defenses in Johnson's behalf; (8) counsel did not object to the trial court's charges to the jury on the standard of reasonable doubt to be used in determining Johnson's guilt; (9) counsel failed to challenge the indictment forms as sent to the jury; and finally, (10) that counsel failed to request a charge to the jury on duress.

■ Having reviewed not only the full transcripts of Johnson's trial, but also the transcript of voir dire proceedings and the state habeas hearing conducted January 7, 1982, the Court concludes that Johnson received at least that level of assistance from counsel at the guilt phase of the trial mandated by the Sixth Amendment to the Constitution.

Prior to Johnson's trial, counsel had the opportunity to attend portions of Jerry Sprouse's trial, and also had access to the trial transcript and all discovery compiled by Sprouse's attorney. Counsel interviewed petitioner at least six times before trial began, and also interviewed most of the policemen and other officials who were involved in the investigation of the case. In light of this investigation, the Court cannot view the decisions of counsel in orchestrating Johnson's defense at the guilt phase of trial as anything other than the tactical choices of competent counsel.

Johnson's own preference as to a defense strategy was that he concede his presence at the crime, but that he would stress that his sexual contact with Susan Edenfield had been made with her consent, and that Sprouse alone was responsible for her subsequent murder. Johnson agreed, after discussion with counsel to take the stand on his own behalf. *Post hoc* consideration of Johnson's testimony on direct examination may suggest alternative paths of questioning and defense, but Franklin's conduct of the defense during the guilt phase of trial appears from the record to have been within the limits of acceptable performance.

## II. Penalty Phase

The same cannot be said of counsel's efforts during the penalty phase of trial. At the state habeas proceeding, Franklin admitted that he had done no investigation

of whether there existed witnesses to testify as to Johnson's good character or other circumstances which might have mitigated against imposition of the death penalty. At the penalty hearing itself, counsel presented no witnesses nor evidence of any kind in Johnson's favor. Counsel also omitted proof of Johnson's theretofore clean criminal history.

In spite of this veritable vacuum of defense at the penalty phase, the state here urges that counsel behaved within the guidelines for constitutionally adequate representation established in *Stanley v. Zant*, 697 F.2d 955 (11th Cir.1983). In *Stanley*, petitioner's trial counsel was accused of failing to investigate mitigating evidence, much as Johnson now accuses his attorney. At his state appeal, Stanley presented affidavits of potential character witnesses who were not investigated by counsel. All would have testified as to the humane qualities and good personal background of the defendant, and also with regard to Stanley's alleged learning disabilities and lack of mental aptitude. Stanley's trial counsel did not testify at the state appeal about why he had failed to prepare such defenses.

■ The Court of Appeals, relying on its earlier opinion in *Washington v. Strickland*, 693 F.2d 1243 (5th Cir.1982) (Unit B), noted that the standard of conduct at the penalty phase of trial was the same as that used to evaluate counsel during the guilt phase of trial. 697 F.2d at 962–63. Presentation of evidence in mitigation of sentence may not be an essential or necessary element of effective representation, *id.* at 965, but "a showing that counsel's decision to forego evidence was *not* based on a reasoned tactical judgment will give rise to an ineffective assistance claim." *Id.* at 966. The court concluded that, based on the evidence before it, counsel's management of the defense at the penalty phase of trial was an acceptable exercise of strategy under the circumstances and satisfied the requirements of the Sixth Amendment.

■ Notwithstanding the state's assertions to the contrary, the facts of *Stanley* were substantially different from those in the case at bar. Most importantly, Stanley's attorney did not testify before the state court on appeal: "the record [was] silent as to counsel's perception of the strategic posture of the case." *Id.* at 969. The Court of Appeals therefore refused to presume that counsel had not engaged in a considerate review of the tactical options open to him for Stanley's sentencing hearing,[2] and found counsel's investigatory efforts prior to the sentencing hearing, minor though they were, to be constitutionally acceptable.[3]

No similar presumptions need obstruct this Court's assessment of counsel's performance on behalf of petitioner Johnson. As he testified at the state habeas proceeding, counsel adopted a trial strategy where he would "put up a smoke screen and hope for the best." During the guilt phase of trial, that strategy was to manifest itself in the impeachment of Mary Lynn Harrod and reliance on Johnson's own testimony that Sprouse had been the triggerman in the murder. At the sentencing phase, counsel merely decided not to present any evidence for the defense, including testimony by Johnson or other witnesses, feeling that Johnson's testimony at the guilt phase had been unimpressive and that the presentation of Johnson's family as character witnesses would have had little impact.

Such a plan of defense can hardly warrant the label of "strategy." Moreover, the complete absence of any background in capital representation on the part of counsel does not allow the Court to suppose

---

**2.** The court noted that "[t]here may well have been sound considerations which dictated that counsel pursue that path he elected." 697 F.2d at 970.

**3.** Counsel evidently did discuss the matter of mitigating evidence with his client and the client's mother. The court declined to consider whether that "investigation" was by itself sufficient to satisfy the Sixth Amendment right to counsel as interpreted in *Washington v. Strickland. Stanley, supra* at 966.

that his choice of defense tactics might be founded upon some deeper personal litigation experience.

Another major discrepancy between *Stanley* and the case at bar is that significant mitigating evidence was presented during the guilt phase of Stanley's trial. Testimony as to Stanley's low I.Q. and mild retardation was submitted by the prosecution in its case in chief. *Id.* at 967. No comparable evidence was presented on behalf of Johnson. Thus, where the *Stanley* court could find no constitutional error in counsel's failure to present redundant evidence in mitigation of the death penalty, the total circumstances of the defense put on for Johnson indicate that the presentation of good character evidence and other witnesses was perhaps the only defense remaining to the petitioner at the penalty phase of trial.

█ Given the lack of cogent defense strategy, counsel's failure at least to investigate the availability of witnesses to appear on behalf of Johnson falls outside the scope of proper assistance of counsel. Even if counsel had articulated a plausible tactical basis for not investigating potential mitigating evidence, "no trial strategy can validate a decision to forego reasonably substantial preparation for and investigation into the defendant's one plausible line of defense." *Baldwin v. Maggio,* 704 F.2d 1325, 1334 (5th Cir.1983); *see also Alvord v. Wainwright,* 564 F.Supp. 459, 475–76 (M.D.Fla.1983).

█ The Court does not intend to imply in this conclusion that counsel was constitutionally required to present mitigating evidence at Johnson's sentencing hearing, *see Stanley v. Zant, supra* at 959–61, but the Court does not hesitate to hold that, where the omission of such evidence is unsupported by reasonable investigation or other substantial strategic grounds, counsel's conduct will not withstand Sixth Amendment scrutiny. *See Washington v. Strickland, supra* at 1257–58.

4. O.C.G.A. § 17–10–2(a) specifies that a defendant's lack of previous criminal convictions is admissible evidence in mitigation of sentence in

Counsel's errors in failing to investigate potentially mitigating evidence were compounded by his failure to investigate and submit to the jury any proof of Johnson's lack of a criminal record. Georgia Code § 17–10–30(b)(1) specifies that a defendant's record of prior capital convictions is an aggravating circumstance which justifies imposition of the death penalty by the sentencing jury. The obverse of that section must hold true as well; a lack of criminal history constitutes a strong source of evidence mitigating against imposition of the death penalty. *See* O.C.G.A. § 17–10–2(a).[4] The mitigation value of a defendant's clean criminal past has been recognized by states other than Georgia. *See Barclay v. Florida,* —— U.S. ——, ——– ——, 103 S.Ct. 3418, 3421–22, 77 L.Ed.2d 1134, 1140–41 (1983) (citing Florida Statute § 921.141(6)(a), defining lack of criminal record as a valid mitigating circumstance in capital cases); *Skillern v. Estelle,* 720 F.2d 839, 843 (5th Cir.1983) (petitioner's co-perpetrator given life sentence by state court based on his lack of substantial criminal record under Texas law).

In this case, the simplest of investigations would have revealed Johnson's lack of prior criminal conduct and provided strong support for Johnson's defense at sentencing. By itself, Johnson's lack of a criminal history may not have induced the jury to recommend a sentence other than death, but certainly counsel's omission of Johnson's record at the penalty phase of trial was another instance where his assistance was ineffective.

**Prejudice**

█ Recognition of counsel's ineffective assistance at the sentencing phase of trial does not fulfill the Court's responsibility on habeas review. The Eleventh Circuit has adopted the position that the Court must also separately determine that the denial of effective assistance was so prejudicial to the petitioner as to warrant granting of a

all non-capital cases, suggesting the importance of a defendant's record in sentencing proceedings.

writ of habeas corpus. Petitioner bears the burden of showing that counsel's ineffective assistance "worked to his actual and substantial disadvantage." *Washington v. Strickland, supra* at 1258. The Supreme Court has recently granted petitioner a writ of *certiorari* in *Washington,* however, —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983), giving this Court pause to consider the question of what showing of "prejudice" is required in the context of constitutionally inadequate representation at the sentencing phase of a capital case.

Expressly rejected by the Court of Appeals in *Washington* was the notion that the ineffective assistance of counsel was *per se* prejudicial to a capital defendant. *Id.* at 1258. Of course, prejudice has been presumed to result from constitutionally inadequate representation in a number of other settings by previous courts. The Eleventh Circuit distinguished those cases, though, by pointing out that the majority of Sixth Amendment cases have involved defendants who were unable to obtain adequate counsel due to state interference, such as in *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), and *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). *Washington v. Strickland, supra* at 1259. The process of identifying and evaluating the effects of that sort of deprivation of counsel makes inquiry into prejudice "an exercise in unguided speculation." *Id.* A *per se* rule of prejudice was thus found necessary by the courts in order to preserve Sixth Amendment rights in such cases.

The prejudice caused by the discrete errors in counsel's own performance, the *Washington* court wrote, require no similar speculation. In fact, the Eleventh Circuit felt that acts of simple misconduct and incompetence by counsel present questions of fact which district courts are well-equipped to answer. *Id.* at 1259. Thus, the district courts need not rely on a *per se* rule in order to dispose of petitioners' claims that they were denied adequate assistance of counsel on those grounds.[5]

Instead, the Court of Appeals required a petitioner to show that, as a result of counsel's ineffective assistance, he incurred some actual disadvantage to his defense. *Id.* at 1262. The burden then shifts to the state to show that any constitutional error was harmless beyond a reasonable doubt. *Id.* This standard at once defines the responsibilities of the parties on habeas review, and also serves to discourage the filing of insubstantial claims in search of habeas relief. The state is appropriately left with the duty to justify the process by which petitioner's conviction and sentence were rendered.

The two-part *Washington* test may on its face provide unequivocal guidance to courts faced with Sixth Amendment claims in a habeas petition, but application of that test remains problematic. The test itself is not inflexible. The Court of Appeals cautioned that it would be wrong "to imply that there is a bright line between the two [prongs of the test]... We recognize ... that such is not always the case. Claimed errors of omission and commission arise in a wide variety of circumstances resulting in substantial imbrication." *Id.* at 1269 n. 33. For example, the court noted those cases in which no prejudice can be found, thus making further inquiry into the actual effectiveness of counsel's performance unnecessary.

The distinction between the questions of whether a defendant received effective as-

---

**5.** The Tenth Circuit within the last year has recognized that certain instances of ineffective assistance of counsel do not require a showing of prejudice to warrant habeas relief. *United States v. Cronic,* 675 F.2d 1126 (10th Cir.1982), *cert. granted,* 459 U.S. 1199, 103 S.Ct. 1182, 75 L.Ed.2d 430 (1983). Where the claim involves "such a lack of preparation and experience" on the part of counsel that "prejudice ... cannot be nicely weighed," the Court of Appeals concluded that prejudice of substantial disadvantage to the defendant's case may be presumed to result from counsel's performance. 675 F.2d at 1128. The Supreme Court may resolve the conflict between the 10th and 11th Circuit rules in considering the respective petitions for writ of *certiorari* in *Washington* and *Cronic.*

sistance at the penalty phase of his capital trial, and whether he was prejudiced by that lack of assistance, seems to be another instance defying bright-line demarcation. While standards of conduct at the guilt phase of trial are reasonably articulated within the rules of pleading and evidence which prescribe the contours of effective defense, the sentencing phase of a capital trial is a process of a wholly different character.

> Trials about life differ radically in form and in issues addressed from those about the commission of a crime, and the cases must be tried differently. The penalty phase of a capital trial differs so greatly from an ordinary criminal trial that the usual standards for assessing competency of counsel in criminal cases are inadequate in death penalty cases.

Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U.L.Rev. 299, 303 (1983).

The precise effects of incompetent representation at the sentencing phase are equally chimerical, for the impact of mitigating evidence and other presentations by the defense are not limited by the law. The jury in its subjective opinion determines the measure of the penalty to be imposed.[6] Accurate appraisal of the impact of defense counsel's actions or omissions on the jury is extremely difficult, if not altogether impossible.

The circuit court may have conceded as much in its recent decision in *King v. Strickland*, 714 F.2d 1481 (11th Cir.1983), wherein an inmate on Florida's death row had his death sentence vacated based on the failure of his attorney to render due assistance at the penalty phase of petitioner's trial. Although purporting to follow the test enunciated in *Washington*, the court's discussion in *King* merely conclud-

ed that "counsel's failure to present available mitigation evidence [under the circumstances] denied King effective assistance of counsel at the penalty stage of trial." 714 F.2d at 1491. There was no discussion of what prejudice counsel's errors may have caused the petitioner. On the contrary, prejudice was seemingly apparent in the fact that "these errors occurred at a particularly critical point in the trial," *i.e.*, the penalty phase of the proceedings. *Id.* at 1490.

The allure of such a facile determination of prejudice beckons to this Court as well, for the ineffective assistance of counsel at a capital sentencing proceeding would seem inherently prejudicial to a defendant. Whether or not that is true, the facts underlying the petition now before the Court strongly suggest that counsel's failure to investigate or prepare in any meaningful way for the defense at petitioner Johnson's sentencing trial produced substantial prejudice to petitioner. Had petitioner's counsel made an adequate investigation prior to the penalty phase of petitioner's defense, he would have discovered much useful to the possible mitigation of the death penalty.

■ At the state habeas proceeding, petitioner produced the affidavits of some nineteen potential witnesses, all of whom stated that, had they been contacted by petitioner's counsel, they would have testified on Johnson's behalf in mitigation of sentence. Such affidavits are not always demonstrative of any prejudice resulting from an attorney's failure to conduct an investigation into mitigating evidence, *see, e.g., Baldwin v. Maggio*, 704 F.2d 1325, 1334 (5th Cir.1983) (additional witnesses omitted would only have corroborated evidence already presented); *Stanley v. Zant, supra* at 969–70 (omission of character evidence consistent with counsel's trial strate-

---

**6.** "There are no clear lines of demarcation which separate a case in which the death penalty is appropriate from a case in which it is not... It is anybody's guess whether a thorough, impassioned plea for mercy on [petition-

er's] behalf by a seasoned, well prepared counsel would have made a difference in the sentence received." *House v. Balkcom*, 562 F.Supp. 1111, 1145 (N.D.Ga.1983), *rev'd on other grounds* 725 F.2d 608 (11th Cir.1984).

gy), but in the present case the omitted character witnesses may have had a significant impact on the jury's decision to impose the death penalty, given the lack of a prior criminal record.

Among the affiants presented by petitioner at the state level, three were law enforcement officials with the Sumter, South Carolina, Law Enforcement Department. All would have testified as to their longstanding knowledge of Johnnie Johnson and to their favorable experience with him during their association. It is almost implausible that such witnesses, given their position in the community, may not have held substantial influence over the sentencing jury had they been allowed to testify. A fourth witness, Jason Dorwart, is a retired Lieutenant Colonel in the United States Air Force and, likewise, would have testified as to petitioner's general good character and good conduct while known by Dorwart. Roberta Mathis, Johnson's high school band instructor, would have testified as to her own extensive personal knowledge of the petitioner and his good work in high school and community music programs.

These unrelated witnesses all could have provided some evidence that the petitioner had a background of good conduct, as well as personal contribution to the Sumter, South Carolina, community. In addition to those witnesses, petitioner also presented to the state fourteen other affidavits of relatives, both immediate and removed, who would have testified that Johnson was a good and loyal family member who cared for his brothers and sisters and helped others in the community when called upon. Though such testimony might be expected of relatives, the value of some evidence of Johnson's personal good character cannot be construed to be without value. Especially in light of the total absence of strategy or investigation underlying the omission of those witnesses, the Court must conclude that the absence of a favorable portrayal of Johnson's character, even by

members of his family, worked to his substantial disadvantage at the penalty phase of trial.

The state argues that, in addition to being self-serving, the testimony of many of petitioner's affiants would have brought with it evidence of Johnson's drug experiences both during and after his tour of duty in the Army. That much is true. It is also true, though, that Johnson's history of drug use was a topic of some discussion during the guilt phase of trial. The jury was aware of it, and the potential witnesses petitioner now brings to the Court's attention would not have contributed much new to the picture of Johnson's drug abuse already presented. In the circumstances of this case, the testimony of character witnesses would have done petitioner far more good than harm, and counsel's failure to present those witnesses constituted the impermissibly ineffective assistance of counsel.

### Witherspoon Claim

Petitioner's next claim for relief is based on the allegation that his trial jury was of unconstitutional composition, to wit: (1) the jury which convicted him and sentenced him to death was selected from a venire illegally culled of candidates holding personal beliefs against capital punishment, as proscribed in *Witherspoon v. Illinois, supra;* and (2) the elimination of jurors who were strictly opposed to the death penalty resulted in the formation of a panel not fairly representative of community opinion. Neither of these claims appears supportable under the relevant precedent as applied to the facts of this case.

In *Witherspoon*, the Supreme Court expressly held that a death sentence was invalid if the jury imposing sentence was chosen by excluding veniremen for cause "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522, 88 S.Ct. at 1777. The states may exclude

those potential jurors who could *never* impose the death penalty, because those persons would be incapable of carrying out the mandates of state law. Jurors who cannot fairly and objectively review the evidence of guilt in a capital case because of their position on capital punishment may also be excused from jury duty. *Id.*

■■■ After examining the transcripts of the voir dire conducted at Johnnie Johnson's trial, it is apparent that the only veniremen rejected for cause based on their opposition to the death penalty were veniremen Louis Bryan, Sam Coleman and Angus Henry. Interrogation of these men revealed that each candidate could not, under any circumstances conceivable at that time, impose the death penalty upon the defendant. The petitioner directs the Court's attention to certain limited passages in the transcript indicating equivocation on the part of each of these veniremen. For example:

Q: Mr. Coleman, the Clerk asked you a question, or the panel of jurors that you were on, a question of whether or not you were conscientiously opposed to capital punishment, and by not saying anything would indicate that you're not opposed to capital punishment; is that correct? (Pause) Are you in favor of capital punishment?

A: No.

Q: But you're not opposed to it?

A: No.

Q: Could you vote to put somebody to death?

A: No.

Q: You could not?

A: No.

Q: Regardless of the facts and circumstances?

A: Well, I just don't—

Q: I'm not asking you, you know, what you—let me clear up one thing. I'm not asking you what you would like to do or not like to do. I'm just asking you if you could—and some people can't—

A: No.

Q: You would never give someone the electric chair?

A: No.

After the state challenged Mr. Coleman for cause, the court directly questioned Mr. Coleman on his beliefs, and the venireman repeated that he could not, under any circumstances, impose the death penalty.

Any confusion on Mr. Coleman's part at the beginning of his questioning is firmly corrected in later questioning. The total effect of Coleman's responses was unequivocally to refuse to inflict the death sentence, *see Spencer v. Zant*, 715 F.2d 1562, 1576–77 (11th Cir.1983), *reh'g granted*, (11th Cir. Dec. 13, 1983), and he was thus permissibly dismissed from the venire. The two other venire persons whose dismissal are here challenged were at least as clear in their rejection of capital punishment, and their removal for cause was also consistent with the holding in *Witherspoon*.[7] *McCorquodale v. Balkcom*, 705 F.2d 1553 (11th Cir.1983).

■■■ Petitioner also challenges the composition of his jury in that, to be representative of a fair cross-section of the community, the panel should have included some members who were definitely opposed to the death penalty. There is no support in the case law for this position. Although Justice Douglas raised such an argument in his separate opinion in *Witherspoon*, *supra* 391 U.S. at 528, 88 S.Ct. at 1780, the Eleventh Circuit has adhered to the teaching of the majority in *Witherspoon* and

---

7. Petitioner also challenges the removal of a fourth candidate, Edward Green. Although taking an equivocal position on the death penalty, Mr. Green was not removed for cause, but by peremptory strike. The prosecution may exercise its peremptory challenges without violating *Witherspoon*. *Antone v. Strickland*, 706 F.2d 1534, 1540 (11th Cir.1983).

consistently rejected this argument. *See Spencer v. Zant, supra* at 1577; *Smith v. Balkcom,* 660 F.2d 573, 578 (5th Cir.1981) (Unit B), *cert. denied* 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982). It appears that petitioner's jury thus met all of the requirements of the Sixth Amendment.

### Enmund and Proportionality

From the evidence adduced at trial, Jerry Sprouse was most likely the triggerman in the murder of Susan Edenfield. Johnnie Johnson, while an active participant in both the abduction of Edenfield and Mary Lynn Harrod and the sexual assault of Edenfield, did not perform the actual shooting of Edenfield and Harrod. Based on his comparatively subordinate culpability for Edenfield's murder, petitioner now argues that the imposition of the death penalty in his case violates the doctrine of proportionality set out by the Supreme Court in *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

The essence of the Court's holding in *Enmund* was succinctly explained by the Fifth Circuit in *Skillern v. Estelle, supra:*

[U]nder the Eighth Amendment a death sentence may not be imposed on someone who neither committed the homicide, attempted to commit the homicide, nor participated in the plot to kill the victim.

The petitioner in *Enmund v. Florida* had been convicted of a felony murder for his part in a homicide committed during a robbery. 458 U.S. at 784, 102 S.Ct. at 3370, 73 L.Ed.2d at 1143. Enmund himself had not been present at the robbery, but was merely the driver of the getaway car and waited on the street for the other perpetrators to commit the robbery. Noting that the focus of the court must be on the culpability of the individual defendant in a capital case, *id.* at 798, 102 S.Ct. at 3377, 73 L.Ed.2d at 1152, the Court held that Enmund could not be sentenced to death in the absence of proof that he had killed or

attempted to kill, or that he had intended or contemplated that life would be taken. *Id.* at 798–99, 102 S.Ct. at 3777–78, 73 L.Ed.2d at 1152–53.

Petitioner Johnson was not convicted of felony murder but, rather, was found guilty of murder as defined by O.C.G.A. § 16–5–1 (1968). The trial jury was charged that:

A person commits a murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being.

The jury was further charged:

[E]very person concerned in the commission of a crime is a party thereto and may be charged with and convicted of the commission of the crime... A person is concerned in the commission of a crime only if he directly commits the crime or, two, intentionally causes some other person to commit the crime under circumstances that the other person is not guilty of any crime either in fact or because of legal incapacity, or, three, intentionally aids or abets the commission of the crime, or, four, intentionally advises, encourages, hires, counsels, or procures another to commit a crime.

Johnson's defense at trial was that he was present at the shooting of Edenfield and Harrod and that he participated in the other events that evening. He insisted, however, that he did not know or expect Sprouse to kill the girls. Therefore, he argues, the imposition of the death penalty in his case is disproportionate to his crime under *Enmund.*

The jury, of course, was not required to believe petitioner's account of the murder. *Skillern v. Estelle, supra* at 844. There was ample evidence upon which to convict Johnson of the murder, for he had been an active participant in all events leading to and including the murder. Johnson had not only been present at the scene of the murder and had participated in the assault and rape of the two girls, but had

also assisted Sprouse in stripping the girls and binding their hands. He then turned the car around in the road, presumably to facilitate a quick getaway, and stood by Sprouse in the road while Sprouse shot the two girls. Viewing the evidence before the trial court in the light most favorable to the prosecution, *Jackson v. Virginia,* 443 U.S. 307, 326, 99 S.Ct. 2781, 2793, 61 L.Ed.2d 560 (1979), this Court finds that the jury could reasonably find that Johnson had been an active party to the murder of Edenfield. His culpability in that crime was not vicarious as was that of the petitioner in *Enmund,* and the holding in *Enmund* does not give this Court cause to hold Johnson's death sentence disproportionate to his crime.

■ The petitioner suggests a second ground on which the Court might find his sentence disproportionate: co-perpetrator Jerry Sprouse, arguably the triggerman in the crime, does not currently have a death sentence. Johnson, although not the prime mover in the murder for which the two men were convicted, does have a valid death penalty pending against him. He argues that, if the triggerman is not facing a death sentence, then his own sentence must be *ipso facto* disproportionate, in violation of the Eighth Amendment.

There is a certain mathematical appeal to petitioner's arguments in this regard. If the petitioner is in fact less culpable of the crime than his accomplice, then it is illogical that he should receive greater punishment than his cohort. Traditionally, however, "proportionality" has referred to the appropriateness of the sentence imposed to the crime committed, *Pulley v. Harris,* — U.S. — at —, 104 S.Ct. 871, 875, 79

L.Ed.2d 29 (1984), and not the appropriateness of the sentence when compared to that imposed on others convicted of similar crimes. The Supreme Court recently decided in *Pulley v. Harris, supra,* that cross-case proportionality review is not required by the Eighth Amendment. Even though Johnson here asks the Court to compare his sentence with that imposed on his co-perpetrator, the Court can see no appreciable difference between Johnson's argument and that rejected in *Pulley.* That Sprouse's sentence was vacated by the Georgia Supreme Court should not bear on the validity of Johnson's sentence.[8] The focus of the capital sentencing procedure should be on the culpability of the individual defendant. *Enmund, supra* 458 U.S. at 798, 102 S.Ct. at 3377, 73 L.Ed.2d at 1152. The subsequent vacation of a co-perpetrator's sentence by an appellate court has no effect on the proportionality of the defendant's sentence.[9]

**Jury Charges**

■ Johnson avers that the court's charges to the jury, as to reasonable doubt at the guilt phase of trial and on mitigating evidence at the penalty phase, were inadequate. Having reviewed the trial record, the Court finds no grounds for disturbing the conclusions of the Georgia State Supreme Court in *Johnson v. Zant,* 249 Ga. 812, 295 S.E.2d 63 (1982), that the trial court's jury charges were proper both as to reasonable doubt and as to mitigating circumstances. *See generally Tucker v. Zant,* 724 F.2d 882 at 890–892 (11th Cir.1984); *Spivey v. Zant,* 661 F.2d 464, 467–72 (5th Cir. Unit B 1982).

**CONCLUSION**

The remainder of petitioner's arguments do not muster support on the record suffi-

**8.** Sprouse currently awaits resentencing in the Georgia court. Even though he does not at the moment have a death sentence, he may well receive one on resentencing. That possibility should perhaps render Johnson's proportionality argument here premature. The Court chooses not to rely on prospective state action in this instance to determine its jurisdiction to consider the merits of petitioner's claims for relief.

**9.** In *Skillern v. Estelle,* 720 F.2d 839 (5th Cir. 1983), the petitioner was in a position similar to Johnson's. His co-perpetrator, the triggerman in a homicide, had his death sentence vacated by an appellate court on double-jeopardy grounds. The circuit court apparently did not consider whether the disparity in the two pending sentences violated the Eighth Amendment.

cient to warrant the Court's greater consideration here. Consistent with the discussion above, therefore, the Court finds that the petitioner has failed to justify the granting of a writ of habeas corpus with respect to his conviction for the murder of Susan Edenfield. His petition for such a writ is hereby DENIED.

Regardless of the lack of merit found in the rest of his petition, the petitioner has presented the Court with a valid claim that he received the ineffective assistance of counsel at the penalty phase of his capital trial and his death sentence must, therefore, be set aside. The petition for writ of habeas corpus with respect to petitioner's death sentence is hereby GRANTED. The death sentence is vacated subject to a new sentencing hearing within a reasonable period of time in the manner provided for by O.C.G.A. §§ 17–10–30 to –44.