STATE of Tennessee, Appellee,

v.

David S. POE, Appellant.

Supreme Court of Tennessee, at Nashville.

July 18, 1988.

Steven T. Atkins, Ted B. Hay, III, Clarksville, for appellant.

W.J. Michael Cody, Atty. Gen. & Reporter, Kymberly Lynn Anne Hattaway, Asst. Atty. Gen., Nashville, for appellee.

## OPINION

HARBISON, Chief Justice.

Appellant was convicted of felony-murder in the Criminal Court of Montgomery County, Tennessee, and was sentenced to death by electrocution. We affirm both the conviction and the sentence.

Appellant was tried with a co-defendant, Jay A. Cameron, for the murder of Private Michael James Marlowe on the night of April 4, 1986. The victim and both defendants in this case were regular Army personnel assigned to active duty with an infantry division at Ft. Campbell, Kentucky. Marlowe was a youth who had reached his eighteenth birthday just eight days before his death. Appellant Poe lacked two months of being nineteen years of age, and Cameron was twenty-one.

The Ft. Campbell military reservation lies partly in Kentucky and partly in Tennessee. The death occurred during off-duty hours after the victim and the two defendants had been drinking beer together at a tavern near the military base. The robbery and murder occurred in a large vacant field located a few blocks from the tavern. The exact time of death was not established, but it apparently occurred after darkness and probably between the hours of 9:30 p.m. and midnight.

Statements taken by military and civilian authorities from Poe and Cameron clearly provided sufficient evidence to warrant their conviction of felony-murder. Both admitted being involved in the merciless beating and robbery of the young soldier, Marlowe, who had just recently been assigned to the Ft. Campbell military base after taking basic training in Texas. Both defendants denied any intention to kill the victim; but if their statements were admissible in evidence, little other proof of the deep implication of both Poe and Cameron would be required. In addition, Cameron testified at the trial, admitted being involved in the robbery and clearly implicated Poe in the homicide.

Although Cameron was also convicted of felony-murder, he received a sentence of life imprisonment rather than the death penalty. While this disparity is not assigned as error in the appeal, evidence was adduced at both the guilt and the sentencing hearings which would justify a finder of fact in differentiating between the two defendants. Under the circumstances of the case, the sentence of death is not disproportionate, nor can it be said that there was no rational basis for the decision of the jury to impose the death penalty upon one of the perpetrators and not on the other.

Although counsel for Poe have presented eleven issues for our review, we find no merit in any of them, nor does our independent review of the record reveal any basis for disturbing the conviction or the sentence.

### A. The Suppression Issues

Counsel for appellant insists that the arrest of Poe on April 25, 1986, three weeks after the date of the homicide, was made without a warrant and was illegal. It is also insisted that the arrest of Poe was in violation of the *posse comitatus* statute, 18 U.S.C. § 1385. Finally, it is urged that the statement taken from appellant was obtained in violation of his right to counsel, which right was not intelligently, voluntarily and knowingly waived. There is no

claim that the statement, if otherwise admissible, should be suppressed because of inadequate warning or other other Fifth Amendment violation.

■ The issue regarding a warrantless arrest is predicated upon certain requirements of Kentucky state statutes which were allegedly not met. The State points out, however, that the arrest of appellant occurred on a U.S. military reservation and was made by authorized Army personnel.

It appears that neither Poe nor Cameron made any kind of official report of their attack on Marlowe during the night of April 4, 1986. Marlowe was on a weekend pass. When he did not report for duty on Monday, April 7, his absence was noted; and within a short time he was carried on military records as being absent without official leave.

Poe, however, talked to a number of persons about the incident, including both Cameron and Private Gregory L. Gray. Gray testified at trial that on or about April 20 or 21 Poe stated that "he had been involved in a murder." He testified:

Q. Well, specifically what did he tell you?
A. He told me that he broke someone's neck.
Q. That he broke someone's neck?
A. Yes, Sir.

Gray testified further:

He told me that him and Jay Cameron had met a 'newby' at a bar, and this guy had just gotten to Fort Campbell, just got out of basic training and he had been flashing some money around, buying people drinks. He said that the kid had bought them some drinks, and that eventually they turned around and he was gone. So, they went outside and found him passed out in the back of a truck, I believe he said. And with the intention to roll him, they took him into a field behind a local grocery store and I believe exactly what he said—said to me, was— it went too far and I broke his neck.

On the morning of April 25, 1986, Gray reported what Poe had told him to a special agent of the Criminal Investigation Divi-

sion at Ft. Campbell. Thereafter special agent Steve Chancellor, who later testified at trial, actively participated in the investigation. On April 25 Chancellor went to the field where he understood the homicide had occurred, and there he found the badly decomposed corpse of Marlowe. This point is located in Montgomery County, Tennessee, about 600 ft. south of the Tennessee–Kentucky state line.

Agent Chancellor ordered other military officers to arrest both Poe and Cameron on the base at Ft. Campbell, and this was done during the morning of April 25. Defendants were brought to headquarters of the Criminal Investigation Division, and subsequently both of them gave taped interviews and signed written statements, admitting their involvement in the robbery of Marlowe on April 4.

Since both the perpetrators and the victim were military personnel on active duty, there seems to be no question but that they were subject to the provisions of the Uniform Code of Military Justice, 10 U.S.C. §§ 801 *et seq. See Solorio v. United States,* — U.S. —, 107 S.Ct. 2924, 97 L.Ed.2d 364 (1987).

The military code specifically permits the arrest of persons by authorized officials based upon reasonable belief that an offense has been committed and that the person apprehended committed it. 10 U.S.C. § 807(b). No warrant is required as appellant insists.

At the time Poe and Cameron were arrested on the base, no Tennessee warrant had yet been issued, but civilian authorities promptly requested such a warrant. Apparently the military officials were not certain at the outset whether to retain the case under military jurisdiction for court martial or to turn the offenders over to civilian authorities for prosecution. The remains of Marlowe were first taken to a military hospital but were later released to the Deputy State Medical Examiner. Poe and Cameron were delivered to civilian authorities, and subsequently Tennessee state warrants were served on them.

We find nothing illegal about the arrest of these individuals at the instance of mili-

tary authorities on the military base. No authority is cited suggesting that either Tennessee or Kentucky retained exclusive jurisdiction over the federal enclave.

■ The *posse comitatus* statute, 18 U.S.C. § 1385, was originally enacted during the Reconstruction era. It provides:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both.

The investigation in the present case commenced with military officials and involved exclusively military personnel. No case has been cited to us holding that there was a violation of the *posse comitatus* statute when both the victim and the perpetrators of the crime were on active military duty. In this case the actions of the military officers were performed primarily to accomplish military purposes; that is, to investigate the death of one soldier at the hands of others.

We are of the opinion that no violation of the statute has been shown by the action of the military personnel in cooperating with civilian officials or in turning over to the civilian officials the arrested individuals and information concerning them.

It is recognized by counsel for appellant that even if there had been a violation of the *posse comitatus* statute, there is no automatic exclusionary rule for such violations. The clear majority of cases which have considered this subject have held that exclusion does not follow as a matter of course but must be determined under the facts of each case. *See, e.g., United States v. Roberts,* 779 F.2d 565, 568 (9th Cir.1986); *United States v. Wolffs,* 594 F.2d 77, 85 (5th Cir.1979); *United States v. Walden,* 490 F.2d 372, 376–77 (4th Cir.1974).

In our opinion, there was no violation of this Act under the circumstances of this case; and even if there were, it certainly could not be said to be flagrant or willful. An enlisted man had been killed, and the military officials had reliable information

that two other enlisted men were involved in committing the crime. We find nothing illegal in either the arrest or the interrogation of Poe and Cameron.

■ We find no substance to the Sixth Amendment claim. At the time of their interrogation, both Poe and Cameron were repeatedly advised of their right to counsel as well as their other constitutional rights. They waived their right to counsel several times and after full advice concerning all of their rights. The trial court conducted a lengthy suppression hearing and found no basis for the suppression of the statement of either of the defendants. Appellant Poe's suppression issues are overruled.

### B. Jury Selection Issues

Appellant insists that the trial court erred in denying individual examination of prospective jurors concerning pre-trial publicity and in its refusal to permit defense counsel to question jurors "regarding their feelings" about the death penalty.

■ It appears that the trial judge did permit individual examination with respect to whether the jurors met the qualifying test of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). It is not insisted that any error occurred in that connection, nor was it shown that the prospective jurors were exposed to potentially prejudicial material in such a way as to mandate individual examination. *See State v. Claybrook,* 736 S.W.2d 95, 99–101 (Tenn.1987); *Sommerville v. State,* 521 S.W.2d 792, 797 (Tenn.1975).

■ The scope and extent of the jury examination are within the sound discretion of the trial judge, and clearly no abuse has been shown in this case. *See State v. Jefferson,* 529 S.W.2d 674, 682 (Tenn.1975). Merely restricting questions about prospective jurors' "feelings" on the subject of the death penalty, in our opinion, did not constitute error; it certainly is not shown to warrant reversal in this case. *See King v. Strickland,* 714 F.2d 1481, 1495 (11th Cir. 1983), *aff'd in part, rev'd in part on other grounds, King v. Strickland,* 748 F.2d

1462 (11th Cir.1984); *State v. Zuniga,* 320 N.C. 233, 357 S.E.2d 898, 910 (1987).

Counsel assign as error the failure of the trial judge to sequester the veniremen who had been tentatively accepted prior to their being sworn.

The jury examination in this case consumed more than two full days. The trial judge did not sequester the veniremen until the panel had been sworn. The trial judge, however, repeatedly admonished the prospective jurors regarding their duties.

Whether to sequester the tentatively selected jurors is a matter committed to the sound discretion of the trial court. *State v. McKay,* 680 S.W.2d 447, 453 (Tenn. 1984). No abuse has been shown in this case, and there is no suggestion of any actual impropriety or misconduct on the part of any of the members of the panel.

Finally, it is insisted that the trial judge erred in not providing counsel for appellant a list of the prospective jurors containing pertinent background information until after the start of the trial.

It appears that prior to the first day of jury selection a jury list was furnished to counsel in accordance with the requirements of Rule 24(g), Tenn.R.Crim.P. The list of persons on the initial list was exhausted during the jury examination on the first and second days of the trial, however, and it was necessary for the trial judge to impanel additional jurors. Counsel were furnished a list of these persons as soon as the names had been drawn. Appellant has shown no prejudice whatever from the failure of his counsel to receive the list at an earlier time. Under the circumstances, in our opinion, the trial judge substantially complied with the requirements of the Rules of Criminal Procedure. No reversible error has been demonstrated, and the motion for mistrial by counsel was properly disallowed.

In their brief counsel suggested that the trial judge did not follow certain statutory requirements in opening the jury selection box pursuant to T.C.A. § 22–2–308(a)(2). There is no evidence in the record that any such violation occurred, nor is there any showing that any such irregularity could have affected the proceedings so as constitute reversible error.

A fourth issue concerns the refusal of the trial judge to declare a mistrial after it was shown that a prospective juror had spoken to a potential witness in the case. This matter was called to the attention of the trial judge. The prospective juror explained that he thought that he might have known the individual and that he expected voluntarily to disclose to the court and counsel any acquaintance he might have with the prospective witness. This juror was not challenged for cause or peremptorily. He was seated on the jury and participated in the proceedings. The foregoing is all of the evidence that the record contains. This evidence did not warrant the granting of a mistrial.

### C. Trial Errors

Counsel for appellant have raised three issues as to proceedings which occurred during the trial. The first of these was the failure of the trial court to grant a mistrial during the guilt phase of the proceedings because of a reference in Cameron's taped interview to some previous criminal misconduct of Poe.

The trial judge gave cautionary instructions to the jury, directing that any such reference be disregarded. The reference was extremely brief. The trial judge felt that counsel should have moved for a redaction of the statement before it was read because the statements of both Poe and Cameron had been the subject of lengthy suppression hearings, and their contents were fully known to counsel. Nevertheless, the trial court instructed counsel to write out curative instructions, and he gave these verbatim as requested.

In our opinion, in view of the overwhelming evidence of the guilt of Poe of the offense on trial, no reversible error occurred. The actions taken by the trial judge were quite sufficient under the circumstances, and his refusal to repeat the curative instructions in the general charge was not error.

The reference was no more than a passing one; and, in our opinion, even if error occurred, it could not have possibly affected the verdict of the jury in the guilt phase. The criminal conduct referred to in this statement was later stipulated and admitted into evidence at the sentencing phase. During the guilt phase, however, the details of the alleged prior conduct of Poe were not developed. While the reference should have been redacted from the Cameron statement, in our opinion the curative instructions given by the trial judge were adequate. As stated, even if error were committed, in the context of this record it was not reversible.

█ Error is assigned because the trial judge limited counsel for Poe in the cross-examination of a taxicab driver, one David Brown. Brown testified that at about midnight on April 4, 1986, he picked up Cameron and another individual near the field where Marlowe's body was found.[1] The witness did not identify Poe as having been present on that occasion. During cross-examination, however, counsel for Poe stated that he would "like this witness to view some other person to see whether or not this might have been the person with the defendant, Cameron." At that time, counsel did not identify the other person whom he wished the witness to view. Since the witness had already said that he could not identify the other person, the trial judge denied the proffered examination.

It later developed that the person whom counsel wished the witness to view was one Chris Bajema. Counsel for Poe called Bajema as a witness at the trial, however, so that the jury had a full opportunity to see and observe this person. Counsel for Poe did not interrogate Bajema as to whether the latter rode in a taxicab driven by Brown on the night of April 4. During cross-examination Bajema denied being with Cameron at all on that occasion. He testified that he had been with Cameron on other occasions, including an instance three months earlier in January when he and

Cameron talked about robbing an intoxicated individual but did not do so.

Under the circumstances we find no error on the part of the trial judge in limiting the cross-examination of Brown.

Counsel for defendant attempted to develop a theory that Cameron and Bajema had returned to the scene of the robbery where Marlowe had been left unconscious, and that Cameron and Bajema then murdered the victim. Cameron attempted to develop a similar theory that Poe had returned to the scene alone and committed the homicide. By their verdict, the jury obviously rejected both theories, which were supported by very little evidence in the record. The limitation on the cross-examination of the taxicab driver, in our opinion, did not unduly limit the attempts of counsel for Poe to develop their theory, particularly since they actually called Bajema as a witness and had every opportunity to examine him on the subject if they had desired to do so.

█ Finally it is urged that the trial court committed error in requiring the trial to proceed past 5:30 p.m. on the fifth day of the proceeding. The introduction of evidence concluded at about 5:30, and counsel for both defendants requested that final arguments be delayed until the following morning. The trial judge, however, directed the arguments to proceed. At least two recesses were called during the evening, and court adjourned at about 9:30 p.m. It is not contended that the trial judge unduly limited the time for final summation by any attorney or that counsel were in any way limited in developing their theories.

In our opinion, this matter lay within the discretion of the trial judge, and no reversible error has been shown.

#### D. Sufficiency of the Evidence

█ In his final issue, Poe insists that he was entitled to a judgment of acquittal. This argument hardly warrants extended discussion because there was overwhelming proof to support the finding of the jury

---

1. Cameron denied this incident and insisted that it never occurred. He admitted having ridden

in Brown's cab on other occasions and suggested that Brown had the dates confused.

that Poe was guilty of felony-murder as found.

Briefly, Poe and Cameron were drinking at the Red Carpet tavern during the early evening of Friday, April 4, 1986, during what was described as the "happy hour." During this time beer was sold at about one-half price.

Young Marlowe, newly arrived at Ft. Campbell, met Sgt. Dan McIntire at a recreation center on the post. McIntire was older and realized that Marlowe did not know many people. He then took McIntire to the Red Carpet so that the latter might meet more young men of his age. McIntire knew Cameron, but he did not know Poe. He was introduced to Poe at the tavern; and, in turn, he introduced Marlowe to the two defendants in this case. McIntire left at some time during the evening, probably between 8:30 and 9:00 p.m.

Before McIntire left, the group drank several pitchers of beer, Marlowe having purchased two of them and some of the other members of the group having purchased the others. Marlowe became intoxicated and went out of the tavern where he was subsequently discovered by Poe and Cameron lying in the back of McIntire's truck. This vehicle had been left at the site when McIntire departed with his wife.

During the evening Marlowe had been seen to have some money on his person. The two defendants blamed each other for responsibility in initiating the scheme to rob him, but both agreed that they decided to "roll" Marlowe. They induced him to accompany them into the vacant field behind a grocery store, and there they proceeded to beat him to death and to rob him. In addition, a leather thong or shoe lace was tied tightly around his neck. Cameron insisted that Poe had the shoe lace and placed it around the neck of the victim who by that time had been beaten into unconsciousness. Cameron insisted that the thong was not tied while he was present at the scene, and he stated that he refused to assist Poe in tying it. Cameron said that he also declined to hold the victim's head while Poe "rammed" the victim's nose into his brain.

When the remains of Marlowe were discovered three weeks later, the thong was tied tightly and firmly in place with a circumference of about 12 inches. Marlowe was shown to have a neck size of about 15 to 15½ inches. One physician testified that if the thong were tied this tightly around the victim's neck, it would produce strangulation. The corpse was so decomposed by the time it was found, however, that the string or thong was hanging loosely, and all of the soft tissue in the neck area had disappeared.

The remains of Marlowe's skull showed a fracture of the jaw in two places and the displacement of several teeth. Experts testified that these injuries resulted from very severe force. The force of the blows sufficient to inflict such injuries could also have been sufficient to produce death.

Poe and Cameron placed responsibility upon each other for the actual homicide although both freely admitted participating in the assault and battery of the victim and in the robbery. The victim had $14.00 in cash in his pocket which Cameron took. He later gave Poe $10.00 of this amount. The victim also had a wallet and a watch. Poe took these items, according to Cameron, and later discarded the wallet. The wallet contained an identification card and a check for $50.00, which had been sent to Marlowe by his grandmother as a present. After leaving the scene Poe and Marlowe burned the check and partially burned the identification card.

Because both of the defendants had blood on their jerseys, or t-shirts, they discarded these and threw them into a pond near a construction site. The discarded wallet of Marlowe was also found at the edge of this pond. Both the shirts and the wallet were retrieved after Poe and Cameron had given their statements to investigating CID agents and a Montgomery County deputy sheriff. The partially burned identification card was also found where the statements indicated it would be. No remnants of the check were ever found.

Although both Poe and Cameron stated that the body of Marlowe was left near a path running through the vacant field, it

was found 30 to 40 feet from the path when discovered on April 25, three weeks later. The jury were not bound to believe that Poe and Cameron left the body near the path, however, because Cameron testified that Poe had warned him during the course of the assault that the path was travelled fairly frequently.

As stated earlier, both Poe and Cameron claimed that the victim was not dead when they left him in the field. The jury, however, were not required to accept that testimony, any more than they were required to accept the rather attenuated theories of each of the defendants that the other came back to the scene and committed the homicide independently or separately in order to prevent the victim from identifying or giving evidence against them. There is ample evidence to support the conclusion of the jury that both Poe and Cameron committed the homicide while in the act of brutally beating and robbing their youthful, intoxicated and practically helpless victim, then strangling him with a leather thong or shoe lace.

In our opinion, this was certainly not a proper case for the entry of judgment of acquittal by the trial judge as a matter of law. The issues were clearly for the jury, and the convictions are supported by evidence of guilt beyond any reasonable doubt.

 No issues are raised concerning the sentencing hearing or the fact that Cameron received a life sentence while Poe received the death penalty. As stated earlier, however, there was a basis in the record for this action by the jury.

Poe did not testify at the guilt phase, and he offered no evidence in the sentencing phase. In the sentencing phase, it was stipulated that he had previously been convicted of a felony under the Uniform Code of Military Justice—assault with a dangerous weapon, a knife.

In imposing the death penalty, the jury found three aggravating circumstances, one of these being that the homicide in the present case was committed during the perpetration of robbery. T.C.A. § 39–2–203(i)(7). The previous conviction

of a felony involving violence to the person was stipulated. T.C.A. § 39–2–203(i)(2). Finally, the jury concluded that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind. T.C.A. § 39–2–203(i)(5).

No issue is made as to the sufficiency of the evidence with respect to the latter aggravating circumstance. It should be pointed out, however, that during the time when he was being assaulted, young Marlowe, according to Cameron, told his assailants to take his money and that it was not necessary for them to beat him. He was obviously conscious during the severe beating which was administered by both of his assailants, regardless of whether he was still conscious after the ligature was tied around his throat.

At the guilt phase, Cameron offered a number of character witnesses, including family members. At the sentencing hearing he did the same and introduced evidence of his social history. He had no prior criminal convictions. He testified at trial, as he had stated in his earlier taped and written interviews, that Poe took the lead in initiating the assault against Marlowe and in the eventual killing of the victim.

Evidence was offered of a previous religious affiliation and activity of Cameron, and there was evidence from which the jury could have been convinced that he was capable of rehabilitation.

While it might be concluded that Cameron was indeed fortunate to escape the death penalty under this record, as previously stated we cannot conclude that its imposition upon Poe was arbitrary or disproportionate. In a number of similar situations, the death penalty has been upheld. *See State v. Caldwell,* 671 S.W.2d 459 (Tenn.1984) (defendant shot victim with whom he left disco); *State v. Campbell,* 664 S.W.2d 281 (Tenn.1984) (defendant beat and robbed elderly man whom he had met in tavern). *See also State v. Barnes,* 703 S.W.2d 611 (Tenn.1985) (two transients brutally murdered an elderly victim but each

accused the other as being the principal instigator).

The judgment and sentence are affirmed at the cost of appellant. The sentence will be carried out as provided by law on October 26, 1988, unless stayed by order of this Court or other appropriate authority.

FONES, COOPER, DROWOTA and O'BRIEN, JJ., concur.