IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 14, 2009 Session

## STATE OF TENNESSEE v. TOMMY DALE TAYLOR, SR.

**Direct Appeal from the Circuit Court for Tipton County**
**No. 5492     Joseph H. Walker, III, Judge**

---

**No. W2008-01006-CCA-R3-CD - Filed July 6, 2009**

---

The defendant, Tommy Dale Taylor, Sr., was convicted by a Tipton County jury of three counts of rape of a child, a Class A felony, for the rape of his granddaughter, who was seven years old when the abuse was discovered. He was subsequently sentenced by the trial court to eighteen years for each count with the sentences to be served concurrently, for an effective eighteen-year sentence at 100 percent in the Department of Correction. On appeal, he argues that the evidence was insufficient to sustain the convictions and that the trial court erred by excluding evidence of the victim's alleged prior sexual abuse, admitting a photograph of the victim's vaginal and anal areas, allowing the trial to continue too long in one day and the jury to deliberate into the late evening hours, and not properly instructing the jury on the election of offenses. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J.C. McLIN, JJ., joined.

Paul J. Springer, Memphis, Tennessee, for the appellant, Tommy Dale Taylor, Sr.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; D. Michael Dunavant, District Attorney General; and James Walter Freeland, Jr. and P. Neal Oldham, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On November 6, 2006, the Tipton County Grand Jury returned a three-count indictment charging the defendant with three counts of rape of a child based on acts he committed against his granddaughter in 2004 and 2005. Specifically, the defendant was charged in count one with a rape that occurred between June 1, 2004, and September 1, 2004; in count two with a rape that occurred

between June 1, 2005, and September 1, 2005; and in count three with a rape that occurred "on or about December 29, 2005."

## State's Proof

The State's first witness at the August 22, 2007, trial was the victim's mother, Jessica Anthony, whose testimony on direct and cross-examination was as follows. The victim, A.H.,[1] was born on July 25, 1998, and was currently nine years old. The defendant, Anthony's father, divorced Anthony's mother when Anthony was young, and Anthony and her two brothers were raised by their mother while a sister was raised by the defendant. Anthony reestablished contact with the defendant in 2003 or 2004, and the victim and the victim's brother began spending time with him at his house trailer on Byrd Lane, where he had a playhouse in which the children liked to play. Sometime in the summer of 2004, the victim informed her that the defendant had watched a "nasty movie" with her and her brother during one of their visits at the trailer. Upon investigation, Anthony discovered in the defendant's VCR a pornographic videotape, which she destroyed. She asked the victim at that time if the defendant had ever touched her inappropriately, and the victim indicated he had not. Anthony never confronted the defendant about the incident, but for several months stopped taking the children to visit him.

Toward the end of 2005, the defendant moved to a house on Charleston-Mason Road, where the children resumed their visits. On December 31, 2005, Anthony learned that the victim had accused the defendant of inappropriate sexual contact. In response, she took the victim first to the emergency room and then to the Carl Perkins Center to be interviewed about the abuse. She also took the victim to see a physician because the victim was experiencing vaginal bleeding, and a few weeks later to the rape crisis center in Memphis for an examination.

Anthony testified that she had enjoyed a good relationship with the defendant from the time she reestablished contact with him until the victim disclosed the abuse. She said the defendant had once given her $50 to pay her cell phone bill, but he had not offered any other financial assistance and she had never asked him for money. She denied any knowledge of the victim's having been inappropriately touched prior to the time that she began visiting the defendant.

Dr. Derrick Hamilton, a pediatrician, testified that the victim's mother brought the victim to his office on January 12, 2006, with the complaint that the victim had been experiencing vaginal bleeding over the past three days. He said that the seven-year-old victim, a very bright and precocious child, reported to him that "she was having pain after being touched and licked and having her grandfather's 'thing,' as she put it, placed inside of her." He stated that he conducted a non-probing, "eyeball" examination of her genitalia to ensure that there were no foreign objects or active bleeding and then referred her to the rape crisis center in Memphis for a more thorough examination. His examination revealed that the victim had mild erythema, or redness, surrounding the external surface of her vagina; a yeast infection, for which he prescribed Monistat; no hemorrhoids or tears in the portion of her anus he was able to examine without applying traction to

---

[1] It is the policy of this court to refer to minor victims of sexual assault by their initials only.

her anus or vagina; and an intact hymen from the three o'clock to the nine o'clock position, the only areas he could see in his non-probing examination. Dr. Hamilton testified that he made a diagnosis of sexual abuse based on the erythema he observed and the history of abuse that the victim disclosed.

Dr. Hamilton testified that the victim's mother brought her back to his office on February 9, reporting that the vaginal bleeding had returned two days previously. At that time, he noted that the yeast infection had cleared but that the victim had a small amount of blood in her panties. Because he could not determine whether the blood was coming from her vagina or her anus, he sent the victim's mother home with "stool cards" for the victim. However, he never again saw the victim after that visit. Dr. Hamilton acknowledged that a yeast infection in a seven-year-old child could be caused by a number of different things, including bubble baths, swimming pools, tight clothing, or sexual abuse. He further acknowledged that a yeast infection could cause vaginal redness but said it would not cause vaginal bleeding. He stated that it was possible for vaginal or anal bleeding to recur after an initial injury, and gave as an example an injury to the anus that might be exacerbated by the passage of stool.

Sally DiScenza, a nurse practitioner with the Memphis Sexual Assault Center, testified that the victim's mother brought the victim to the center on January 20, 2006, where DiScenza first separately interviewed Anthony and the victim and then conducted a physical examination of the victim. She said that the victim told her that her grandfather had touched her private parts and pointed to her vaginal area as the part of her body that had been touched. The victim also told her that her clothes and her grandfather's clothes were down, that the touching occurred more than ten times, and that her grandfather told her not to tell anyone because he could go to prison. DiScenza stated that, although the victim was very bright, she was very uncomfortable talking about the sexual assault. She, therefore, pushed her only as much as necessary to obtain the information she needed for the physical examination.

DiScenza testified that she twice asked the victim if the defendant had touched her buttocks area and she said both times that he had not. The victim's physical examination, however, revealed that she had anal fissures at the one o'clock, five o'clock, and seven o'clock positions, as well as "anal dilation." DiScenza stated that "fissuring is where there is injury that has penetrated through, caused the scarring when it healed, and it caused the irregularity of the tissue in those areas." She said that anal dilation was an autonomic response that can develop in victims of chronic abuse or injury where "when that area is stimulated, it will dilate up so that it will not be injured any further." When asked about the inconsistency between her physical findings and the victim's account of the abuse, she explained that child sexual abuse victims are sometimes either unable or unwilling to reveal the full extent of the assault:

> And again, on children there's two things that can happen with that that we find. Number one, is sometimes they're not able to identify exactly where on their bodies an assault has occurred. And number two, sometimes children will only disclose enough to get the assault to stop and won't go any further.

Over the defendant's objection, DiScenza identified a photograph of the victim's vaginal and anal areas, which showed the anal fissures. She testified that in addition to the anal fissures, the

victim had abnormalities in her hymenal area, consisting of a notch at the three o'clock position and narrowing of the tissue from the nine o'clock to the three o'clock position. She stated that a notch is typically caused by "some type of trauma" and that "narrowing of tissue is indicative that there was some type of penetration." Based on her observations, she opined that the victim had suffered chronic sexual assault.

On cross-examination, DiScenza acknowledged that the victim initially told her that the last time the defendant had assaulted her was at the house trailer. She said that the information was not consistent with the history she had obtained from the victim's mother, so she asked the victim again. The second time she asked, the victim told her that the last time the defendant had touched her was in the house. DiScenza stated that because the victim's last contact with the defendant was reported to have occurred three weeks previously, meaning that it was not an acute case, she did not collect evidence for a rape kit.

The victim testified that the defendant repeatedly did bad things to her both at his house trailer and at his house. Referring to her vagina as either her "private" or her "frog," and the defendant's penis as his "snake," she said that at the playhouse at the trailer the defendant would get on top of her and "hump [her]." The defendant's clothes would be off, and her clothes sometimes were on and sometimes off. She said that the defendant touched her vagina with both his hand and his penis, which he pushed "up in [her] private,"causing her pain. The defendant told her not to tell anyone and that he would kill both himself and her if she did. The victim stated that her younger brother was sometimes at the trailer when the playhouse incidents happened but was always inside. She said that the woman who lived with the defendant, whom she used to refer to as her grandmother, was at work when the incidents occurred.

The victim also remembered having watched "nasty movies" with the defendant at his house trailer. She said that she and the defendant were alone while the movie was playing and that she sat clothed in the recliner while the defendant stood in front of the television and pushed his penis up and down with his hand until "stuff" came out of it. She stated that the defendant had a box full of Barbie doll parts at the trailer and "would take a Barbie doll leg and stick it up" her vagina.

The victim testified that the defendant moved into a house after living in the trailer and that she visited him there a number of times. The defendant had a swimming pool at the house and sometimes made her swim "butt [sic] naked." She recalled other times when he would come into a bedroom in the house, lay her down, and, while both she and he were naked, touch her vagina with his hands and his penis, which he would "push . . . up . . . in [her] frog." As he pushed his penis inside her, he would say things like, "Oh, yeah." The victim testified that the defendant also made her get on top of a dryer in a back room of the house, placed white cake frosting on her vagina, and then licked it off. The victim at first testified that the defendant never touched her anus, or "bottom," but then recalled that he had placed his finger and his penis inside it. She could not, however, recall whether the episode happened at the trailer or at the house. She said that she eventually told her Aunt Jessica about the abuse. On cross-examination, she said that the defendant touched her "[a] whole bunch of times at the trailer, and then at the house a whole bunch of times, too." She stated that the defendant at one time hurt her so much that she began bleeding.

The victim's younger brother, who was seven years old at the time of trial, testified that when he and the victim were at the defendant's house the defendant sometimes sent him outside to play. During one of those times, he looked through the window and saw the defendant and the victim "kissing and stuff" in a room of the house.

Jessica Dancy testified that she and Anthony had been best friends for seven and a half years and that she had therefore known the victim for most of the victim's life. On December 31, 2005, the victim, who had returned the previous morning from a visit to the defendant's house, approached her and said she needed to tell her something and wanted to say it in her ear. She leaned down, and the victim said, "Pawpaw Tommy has been doing sex stuff to me." She questioned her about it, and the victim told her that the defendant would "kiss on her and kiss around her titties, and put her on the dryer and lick on her frog." Dancy said that when she asked the victim if the defendant had done something to her during her last visit, she told her "just the same stuff that he always did." She testified that she and Anthony took the victim to the emergency room the next day and then later to a physician because she was experiencing intermittent vaginal bleeding, which required the use of two to three panty liners per day.

On cross-examination, Dancy testified that at the time the victim made the disclosure, the victim, Anthony, and Anthony's son were living in the same residence with Dancy and Dancy's father, boyfriend, and daughter. She said she was unaware of the victim's having been exposed to any sexual activity prior to the allegations in this case. She did, however, know that Anthony had been a victim of sexual abuse in the past because Anthony had told her.

**Defendant's Proof**

The defendant's son, Tommy Dale Taylor, II, testified that he learned of the allegations against his father from his wife, who had been informed by Jessica Dancy. He said that he in turn informed the defendant.

Sandra Billings, the defendant's fiancée, testified that she was always present when the defendant babysat the victim and her brother at the house trailer because she was out of work until October. According to her testimony, it was not possible to see into the windows at either the trailer or the house because the trailer's windows were too high off the ground and the windows at the house were either too high or blocked by an air conditioner. She said that a few months before she started work, Anthony had a dispute with the defendant over a car and stopped bringing the children to the trailer to visit.

Billings testified that Anthony resumed the visits when she and the defendant moved to the house on Charleston-Mason Road and frequently showed up on the defendant's payday wanting money from him. The defendant always gave Anthony money when he was working, but he was out of work for several weeks during the winter of 2005 and therefore unable to give her the $200 to $300 she wanted to purchase a jeep. According to Billings, Anthony was upset when she did not get the money and brought the children to visit only once or twice more before making the sexual abuse allegations against the defendant. Billings stated that the last time she saw the victim was on an overnight visit from December 28 to December 29, 2005. She said that Anthony was dropping

the children off when she arrived home from work on December 28 and had already picked them up by the time she left for work on Friday, December 29. She stated that she was a light sleeper and had never heard or seen anything to indicate that the defendant had engaged in any inappropriate behavior with the victim.

When informed on cross-examination that December 30, 2005 was a Friday, Billings essentially conceded that the overnight visit must have occurred on December 29-30, 2005, testifying she was certain that it was a Thursday when Anthony dropped the children off and a Friday when she picked them back up.

Tracy Joyner, Anthony's sister, testified that she was raised by the defendant while Anthony and her two brothers were raised by their mother. She said that she and the defendant were "pretty close" and that she and Anthony used to be close before the allegations arose but no longer spoke. She stated that she was at the defendant's house at Christmas time in 2005 and observed that the victim appeared happy and exhibited no signs of having been sexually abused. Joyner testified that she believed she would have recognized the signs because both she and Anthony had been the victims of child rape. She was aware of the defendant's having given Anthony money at different times and recalled the incident where Anthony became angered at the defendant's refusal to give her money to purchase a jeep. She testified that Anthony, the victim, and the victim's brother were living at that time in a residence with ten or twelve other people, including Jessica Dancy and Dancy's father, whom Anthony was dating. Finally, she testified that the defendant had never abused her and that she had no reason to believe that he had ever engaged in the type of conduct alleged in the case.

Sabrina Lovett testified that Anthony brought the children to her house almost every day during the summer of 2003. On one occasion that summer, she found the victim and the victim's male cousin, both four at the time, lying on the ground together underneath the front porch with the victim giving her cousin oral sex while at the same time trying to insert a large metal spoon into her vagina. Lovett testified that the victim's actions led her to believe that the victim had been sexually abused. She said that she made three different appointments for the victim to see a physician but that Anthony never kept any of the appointments and soon thereafter stopped bringing the children to her house. Lovett stated that the defendant had been around her children and that she had never had any problem with him.

The forty-six-year-old defendant testified that he loved his grandchildren and was sick about the allegations against him. He said that the victim never insinuated that anyone was abusing her and never appeared reluctant to come to his house. However, on her last visit at Christmas time she became angry at him because he would not let her play with a glass chess set. He stated that he often gave Anthony and the grandchildren money but refused to buy a jeep for Anthony. In response, Anthony "got mad and . . . stomped off." The defendant adamantly denied having abused the victim and said that he would never hurt any child. On cross-examination, he said he believed that Anthony and Dancy had coached the victim's testimony against him. He also expressed his opinion that the victim had herself fabricated some of the details of her testimony: "Yeah, she got quite a[n] imagination now. You heard what the people said. She got a IQ bigger than anybody's in here."

## I. Sufficiency of the Evidence

As his first issue, the defendant challenges the sufficiency of the convicting evidence. When the sufficiency of the convicting evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant asserts that the State's entire case was based solely on the victim's testimony and that "[a] close review of the record reveals so many inconsistencies and evidence that the victim in this case was coached." He cites the timing of the initial onset and recurrence of the victim's vaginal bleeding to argue "that whatever was causing the injuries to the victim . . . [was] still present long after she had no further contact with the [defendant]." He also argues that Dr. Hamilton's and Nurse DiScenza's physical findings were "in direct conflict with one another," as Dr. Hamilton found no evidence of anal fissures or tears in the hymen while Nurse DiScenza found evidence of healed damage to both the victim's anus and vagina. The defendant suggests that "it is possible or even probable" that the victim's injuries occurred during the eight days that elapsed between her examinations by Dr. Hamilton and Nurse DiScenza and argues that, even in the light most favorable to the State, "a reasonable jury could not have reconciled these vastly inconsistent stories in favor of conviction beyond a reasonable doubt." The State argues that the evidence was sufficient to sustain the convictions, and we agree.

The defendant was convicted of three counts of rape of a child. At the time of the offenses, rape of a child was defined as the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a) (2003). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body." Id. § 39-13-501(7).

At the conclusion of the State's proof, the prosecutor elected to rely for count one on the incident that occurred in the playhouse of the trailer on Byrd Lane; for count two on the incident that occurred in a bedroom of the house on Charleston-Mason Road; and for count three on the incident the victim described in which the defendant licked cake frosting off her vagina while she was on top of a dryer in a back room of the house. The evidence presented at trial was sufficient for the jury to find the defendant guilty of three counts of rape of a child based on these incidents. The victim testified that the defendant "humped" her in the playhouse at the trailer, inserting his penis inside her vagina and causing her pain. She described a similar episode of penile-vaginal intercourse that occurred in a bedroom of the house and a separate episode of cunnilingus that occurred in a back room of the house.

Moreover, the victim's account of having been repeatedly molested by the defendant was consistent with the testimony of Nurse DiScenza that the victim exhibited signs of chronic sexual assault, which included anal dilation, anal fissures, a notch in the hymen, and a narrowing of the hymenal tissue. It was also consistent with Dr. Hamilton's testimony that the victim presented to his office with a complaint of vaginal bleeding and that he found her to be suffering from mild erythema in the tissues surrounding the external surface of her vagina and a yeast infection. In addition, the victim named the defendant as the perpetrator of the abuse in her conversations with both Dr. Hamilton and Nurse DiScenza, telling Dr. Hamilton that the defendant had placed his "thing" in her and Nurse DiScenza that the defendant had touched her private parts more than ten times while both his clothes and her clothes were down.

We respectfully disagree that the findings of Dr. Hamilton and Nurse DiScenza directly conflicted with each other or that the timing of the victim's vaginal or anal bleeding makes it improbable that the defendant was the perpetrator of the abuse. Dr. Hamilton was clear in his testimony that the physical examination he conducted was limited in scope, unlike the one conducted by the nurse practitioner at the rape crisis center. He specifically stated, for example, that he viewed the victim's anus and vagina without applying traction to either, which limited the areas that he was able to see. He also explained that it was possible for vaginal or anal bleeding to recur some time after an initial injury. In sum, there was ample proof presented from which a rational trier of fact could find the defendant guilty of the three counts of rape of a child beyond a reasonable doubt. We conclude, therefore, that the defendant is not entitled to relief on the basis of this issue.

## II. Exclusion of Evidence of Alleged Prior Abuse

The defendant next contends that the trial court committed prejudicial error by excluding evidence of the victim's alleged prior sexual abuse. At trial, the defendant sought to introduce testimony from his son, Tommy Dale Taylor, II, that he was present at his mother's house in 2003

or 2004 when the victim approached his mother and said her stepmother had "messed" with her on her breasts and "down there at her bottom." The defendant sought to introduce similar testimony from Sabrina Lovett that after she discovered the victim performing oral sex on her male cousin, the victim told her that her stepmother had "messed with her" when she was in the bathtub by inserting her finger inside her. The trial court ruled the proffered testimony inadmissible due to the defendant's failure to comply with the ten-day notice requirement of Tennessee Rule of Evidence 412.

We conclude that the trial court properly excluded the challenged testimony. Tennessee Rule of Evidence 412 prohibits the introduction of evidence of specific instances of a victim's sexual behavior unless it is offered for one or more of a limited number of purposes and certain procedures for seeking its admission have been followed. The rule provides in pertinent part:

> **(c) Specific Instances of Conduct.** Evidence of specific instances of a victim's sexual behavior is inadmissible unless admitted in accordance with the procedures in subdivision (d) of this rule, and the evidence is:
>
> (1) Required by the Tennessee or United States Constitution, or
>
> (2) Offered by the defendant on the issue of the credibility of the victim, provided the prosecutor or victim has presented evidence as to the victim's sexual behavior, and only to the extent needed to rebut the specific evidence presented by the prosecutor or the victim, or
>
> . . . .
>
> (4) If the sexual behavior was with persons other than the accused,
>
>> (i) to rebut or explain scientific or medical evidence, or
>>
>> (ii) to prove or explain the source of semen, injury, disease, or knowledge of sexual matters[.]

Tenn. R. Evid. 412(c). Subsection (d) provides in pertinent part:

> **(d) Procedures.** If a person accused of an offense covered by this Rule intends to offer under subdivision (b) reputation or opinion evidence or under subdivision (c) specific instances of conduct of the victim, the following procedures apply:
>
> (1) The person must file a written motion to offer such evidence.
>
>> (i) The motion shall be filed no later than ten days before the date on which the trial is scheduled to begin, except the court may allow the motion to be made at a later date, including during trial, if the

court determines either that the evidence is newly discovered and could not have been obtained earlier through the exercise of due diligence or that the issue to which such evidence relates has newly arisen in the case.

Tenn. R. Evid. 412(d)(1)(i).

The defendant does not dispute that he failed to comply with the notice requirements of Rule 412. Instead, he argues that the evidence he sought to introduce was relevant to impeach the victim's credibility and admissible under the exception in Rule 412(d) for newly discovered evidence that could not have been easily obtained earlier through the exercise of due diligence. The defendant contends that the trial court "conceded that the motion made by defense counsel during trial fell within the exception" for newly discovered evidence because it allowed Lovett to testify about the victim's alleged sexual encounter with her cousin "despite the same Rule 412 objection by the State." We respectfully disagree.

The record reveals that the trial court allowed Lovett's testimony about the front porch incident on the basis that it was relevant to explain or rebut medical evidence, specifically, to explain the source of the victim's injuries or knowledge of sexual matters. The defendant did not argue, and the trial court never considered, whether the testimony constituted newly discovered evidence that could not have been easily obtained earlier through the exercise of due diligence. It appears, in fact, that the trial court simply overlooked the notice requirements of the rule in admitting Lovett's testimony. The court's ruling states in pertinent part:

> All right. Although the procedures under Rule 412 were not complied with, one specific instance the Court is going to allow the witness to testify to for purposes, the Court finds, that evidence of specific instances of a victim's behavior is inadmissible unless admitted in accordance with the procedures set forth in subdivision D and the evidence is . . . offered by the defendant in this particular case, to the extent needed to rebut specific evidence presented by the prosecution or victim, to . . . explain or rebut scientific or medical evidence. And one of those is listed, "as to prove or explain the source of any injury or knowledge of sexual matters."
>
> So, as far as the hearsay goes, the Court is going to sustain the objections with regard to all the witnesses. But the Court will allow, if you can phrase your questions to Ms. Lovett, the Court is going to allow her to testify about what she observed.

Although the testimony the trial court allowed would have been admissible to rebut medical proof offered by the State had the notice requirements been met, neither it nor the excluded testimony constituted newly discovered evidence under the rule, as there was no proof that the defendant did not have access to these witnesses prior to trial and had not long known of their proposed testimony. Thus, because the notice requirements of the rule were not met, the trial court should have excluded not only Taylor and Lovett's testimony with respect to the victim's alleged

accusation against her stepmother, but also Lovett's testimony about the victim's alleged sexual encounter with her cousin. The defendant is not, therefore, entitled to relief on the basis of this issue.

## III. Admission of Photograph

The defendant next contends that the trial court erred by admitting the photograph of the victim's vaginal and anal areas, arguing that the photograph was both highly prejudicial and irrelevant, as the victim denied to Nurse DiScenza that she had been anally penetrated by the defendant.

The admissibility of photographs generally lies within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing that the trial court abused its discretion. State v. Faulkner, 154 S.W.3d 48, 67 (Tenn. 2005); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). "Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases." State v. Morris, 24 S.W.3d 788, 810 (Tenn. 2000). In determining whether a photograph is admissible, the trial court must first determine whether it is relevant to a matter at issue in the case. See Tenn. R. Evid. 401; State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998); Banks, 564 S.W.2d at 949. The court must next consider whether the probative value of the photograph is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403.

The trial court overruled the defendant's objection to the photograph without explaining its ruling. The prosecutor argued at trial, however, that the photograph was relevant both to show the injuries to the victim's anus and the close proximity of her anus to her vagina, which supported Nurse DiScenza's testimony that a young child often has difficulty distinguishing where on her body an assault has occurred. We agree that the photograph was relevant to these issues and that its probative value outweighed any possible prejudicial effect. We conclude, therefore, that the trial court did not abuse its discretion in admitting the photograph.

## IV. Failure to Continue Trial to Second Day

As his next two issues, the defendant contends that the trial court erred by not continuing the trial to the next day and by allowing the jury to deliberate into the late evening hours. The State argues that the defendant has waived the issue by acquiescing to the late evening session and that the trial court did not abuse its discretion in the manner in which it conducted the trial. We agree with the State.

In State v. Parton, 817 S.W.2d 28, 33-34 (Tenn. Crim. App. 1991), this court concluded that late night court sessions should be held only when required by unusual circumstances. Generally, however, a trial judge has broad discretion over the course and conduct of a trial, see State v. King, 40 S.W.3d 442, 449 (Tenn. 2001), and the determination of how late into the evening a trial session should be conducted is within the discretion of the individual trial judge. See State v. Poe, 755 S.W.2d 41, 47 (Tenn. 1988).

The transcript does not reflect what time the State completed its proof. At that time, however, the trial court inquired how counsel felt about continuing the trial that day. Defense counsel reported that he anticipated about five witnesses and more than an hour's worth of proof and proposed continuing the trial to the following morning. The trial court then stated that one of the jurors had mentioned that he had a conflict the next day, but if it was "convenient or okay with the jury, then we'll break until tomorrow." After a recess, the court announced that it was going to allow defense counsel to begin his proof that day. Other than expressing initial surprise, defense counsel did not protest, stating "okay" and "[t]hat's fine."

The record reflects that the jurors were sent to supper after the defendant completed his proof, returned to hear closing arguments and jury instructions, and then retired at 8:28 p.m. for deliberations. The record next reflects that the parties assembled in the courtroom at 10:49 p.m. for the court to read a jury question. After handling that matter, the court consulted with counsel about how they wanted to proceed in the event that the jury did not soon reach its verdicts:

> Before we break, I want to get some idea on what y'all think is the best course of action. The jury was not really voir dired on returning tomorrow, so I don't really know whether more than one juror has a problem with it. We know that one juror is supposed to start vacation in the morning. I don't know what kind of vacation, just that he mentioned that to the bailiff, and that's the reason that I went on and finished up tonight instead of having them come back tomorrow. That may be the situation with more than one juror.
>
> But if they're going to go very late, I'd like to call them in and I guess see whether they can come back tomorrow perhaps. I don't know where they are, and apparently they're still discussing the facts.

The prosecutor suggested that such a course of action was premature, and defense counsel agreed that the jury should be allowed to continue its deliberations uninterrupted for the present:

> [DEFENSE COUNSEL]: And so I think it may be a question that we need to pose in terms of what their availability is and so on. I would say we can just go ahead and wait and see if they come back with something at a time close to that period of time [midnight], and then call them in at that point if they're still out.
>
> THE COURT: Okay. If that's satisfactory, that's what we'll do then.

At 11:00 p.m., the jury returned to the courtroom to report its verdicts.

We, therefore, agree with the State that the defendant has waived the issue by acquiescing to the late evening court session and jury deliberations. See Tenn. R. App. P. 36(a); State v. Reid, 91 S.W.3d 247, 301 (Tenn. 2002) (adopting in appendix this court's conclusion that defendant waived issue of late night court sessions by failing either to object at trial or to raise the issue in motion for new trial). Moreover, the record reflects that the court had a valid reason for continuing the trial into the evening hours, that the jury was given supper and other appropriate breaks, and that

-12-

it returned with its verdicts at 11:00 p.m., which was not an unduly late hour. We conclude, therefore, that the defendant is not entitled to relief on the basis of this issue.

## V. Election of Offenses

As his final issue, the defendant contends that the State "never offered any unique surroundings or circumstances sufficient to meet the 'election doctrine'" and that the trial court "failed to properly instruct the jury regarding the 'election doctrine' as required under the law." The State responds by arguing that the defendant has waived consideration of this issue by not raising it in his motion for new trial. The State further argues that there was either no error in the instructions or that any error was harmless beyond a reasonable doubt.

Because the defendant failed to include this issue in his motion for new trial, we review only for plain error. See Tenn. R. App. P. 3(e); State v. Roland R. Smith, No. M2004-01457-CCA-R3-CD, 2005 WL 1541874, at *7 (Tenn. Crim. App. June 29, 2005), perm. to appeal denied (Tenn. Dec. 5, 2005) ("[T]he doctrine of election of offenses touches on a criminal defendant's fundamental constitutional rights and is therefore subject to plain error review, whether or not raised in a motion for new trial.") (citing State v. Kendrick, 38 S.W.3d 566, 567 (Tenn. 2001); State v. Walton, 958 S.W.2d 724, 726-27 (Tenn. 1997); State v. Clabo, 905 S.W.2d 197, 204 (Tenn. Crim. App. 1995)).

The doctrine of plain error provides that where necessary to do substantial justice, an appellate court may take notice of a "plain error" not raised at trial if it affected a substantial right of the defendant. Tenn. R. Crim. P. 52(b). In order for us to find plain error, "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'" State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). A court's discretion to notice plain error is to be "sparingly exercised." State v. Bledsoe, 226 S.W.3d 349, 354 (Tenn. 2007). Consideration of all five factors is unnecessary when it is clear from the record that at least one of them cannot be satisfied. Id. at 355.

No clear and unequivocal rule of law was breached in this case. The doctrine of election of offenses requires that when there is evidence at trial that a defendant has committed multiple offenses against a victim, the State must elect the facts upon which it is relying to establish each charged offense. State v. Johnson, 53 S.W.3d 628, 630 (Tenn. 2001) (citations omitted). "The election requirement safeguards the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." Id. at 631 (citation omitted). After issuing the standard pattern jury instructions on the election of offenses, the court instructed the jury on the specific incidents on which the State was relying for each count of the indictment:

> In Count 1, rape of a child, the act occurring at the play house at the trailer; in Count 2 of rape of a child, the act occurring at the house in the bedroom; in Count 3, the act alleging the frosting and events on the dryer. You are to consider only this

alleged act in deciding whether or not the defendant has been proven guilty beyond a reasonable doubt of the offense charged in each count.

In addition, the prosecutor delineated each incident in more detail during closing argument. As the State points out in its brief, although the victim testified that the defendant touched her numerous times at the trailer and at his house, she did not differentiate between different episodes of penile-vaginal intercourse that occurred in the playhouse or between different episodes of penile-vaginal intercourse that occurred in the bedroom of the house. She also described only one incident of cunnilingus involving cake frosting while she was on top of the dryer in the house. Thus, there was no danger that the jurors were considering different offenses when deliberating on each individual count of the indictment. We conclude, therefore, that there was no error in the election of offenses instructions to the jury.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE